Repplier Coal Company v. Commissioner.
Repplier Coal Co. v. Commissioner
Docket No. 105931.
United States Tax Court
1942 Tax Ct. Memo LEXIS 81; 1 T.C.M. (CCH) 141; T.C.M. (RIA) 42621; November 24, 1942
*81 1. Allowances for the exhaustion, wear and tear of depreciable property during the taxable years determined. 2. Profits from the sale and rental of supplies furnished to petitioner's employees held not includible in "gross income from the property" for percentage depletion purposes; held, further, the total wages payable, without reduction by reason of amounts charged thereto for the supplies so furnished, must be deducted in computing "net income from the property" for the purposes of the 50 per cent limitation upon percentage depletion. 3. Petitioner, having elected to take depletion upon the percentage basis, must look only to percentage depletion deductions for the recovery of the capital required to construct a tunnel after its mine had passed the development stage, and may not obtain additional deductions for the same item as so-called deferred operating expenses. R. C. Peterson, Esq., for the petitioner. R. S. Garnett, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The Commissioner determined income tax deficiencies for the years 1935 and 1936 in the respective amounts of $8,117.99 and $3,659.26, and a deficiency in excess profits tax for the *82 year 1935 in the amount of $2,741.67. Petitioner claims an overpayment of income tax for 1936 in the amount of $1,067.91. There are three issues: (1) the amount of depreciation, if any, to which petitioner is entitled with respect to improvements on leased property; (2) whether profits from the sale and rental of supplies to its employees should increase the allowable percentage depletion deductions, either as an inclusion in "gross income from the property" or as a reduction in the cost of labor in computing "net income from the property" for the purpose of the 50 percent limitation; and (3) whether the cost of constructing a tunnel may be recovered as a deferred operating expense over the period of production and sale of the coal made available thereby, or, on the other hand, is to be returned through percentage depletion deductions. The proceeding was submitted upon a stipulation of facts with exhibits attached thereto and the introduction of petitioner's returns for the years 1930 to 1934, inclusive. Findings of Fact Petitioner, a Pennsylvania corporation, is engaged in the business of mining, producing and selling coal. Its returns for the years involved were filed with the *83 Collector at Philadelphia, Pennsylvania. On August 14, 1922, petitioner acquired by assignment two coal leases. The first lease was to expire on December 31, 1932, and at the time of its acquisition by petitioner there was situated thereon the socalled Darkwater Plant. The other lease was to expire on July 31, 1934 and upon this lease petitioner constructed a plant, hereinafter known as the New Castle Plant. Construction was begun in the fall of 1925 and completed in 1926. Petitioner also constructed a railroad siding on this leasehold during 1926. The cost of the three depreciable properties on January 1, 1930, before deducting depreciation for years prior to 1930, was as follows: New Castle Plant
$912,336.11
Darkwater Plant
53,218.39
Railroad Siding
12,139.91
Total
$977,694.41
The adjusted bases for determining gain or loss of the New Castle Plant, the Darkwater Plant and the railroad siding on January 1, 1930, after deduction of all depreciation allowed or allowable, were as follows: New Castle Plant
$655,195.05
Darkwater Plant
26,613.12
Railroad Siding
8,671.37
Total
$690,479.54 Petitioner made improvements and additions to the New Castle Plant during *84 1930 and subsequent years at the following costs: $2,922.86 in 1930; $20,468.76 in 1931; $7,775.47 in 1932; $3,500.00 in 1935; and $4,902.35 in 1936. In 1933 it sold part of this plant, which part had cost it $100.00. During the years 1930, 1932 and 1933 petitioner was affiliated with other corporations with which it filed consolidated returns. Separate returns were filed for 1931 and 1934. The following table shows, for the five years from 1930 to 1934, inclusive, the total depreciation deductions claimed by petitioner on its returns with respect to the two plants and the railroad siding, the separate net income or loss of the petitioner, the net income or loss of the affiliated company reported on consolidated returns, and the consolidated net income or loss for the years of affiliation: Net Income
Depreciation
Petitioner's
(Or Loss) of
Consolidated
Deductions
Net Income
Affiliated
Net Income
Year
Glaimed
(Or Loss)
Company
(Or Loss)
1930
$226,710.29
($29,757.18)
($3,348.54)
($33,105.72)
1931
226,710.24
(207,874.13)
1932
226,710.24
(215,531.16)
71,230.78
(144,300.38)
1933
45,616.81
131,070.42
(236,301.03)
(105,230.61)
1934
168,098.08
(10,028.31)
*85 The Commissioner did not disturb or adjust the returns for the years 1930 to 1934, inclusive, except to reduce depreciation for the year 1930 to $207,323.86. Petitioner's net loss of $29,757.18 for the year 1930 was carried over and deducted on its return for the year 1931. The useful physical life of the mining plants was 20 years at the time of their construction. On January 1, 1933 the lease upon which the Darkwater Plant was situated was extended upon the same conditions for a term at the will of petitioner. The lease, as renewed, could be terminated by petitioner at any time upon the giving of 21 days' notice. A new lease covering the other tract, upon which petitioner had constructed the New Castle Plant, was granted to petitioner on August 1, 1934. The new lease was on a month-to-month basis, terminable by either party upon 30 days' notice. There have been no notices of termination under either of the latter leases. Until the execution of the leases on January 1, 1933 and August 1, 1934, petitioner had no assurance that they would be executed. The New Castle plant was constructed by petitioner without consideration of whether the then existing lease would be renewed. The *86 original Darkwater lease contained the following provision: And it is further covenanted and agreed that at the expiration of the term hereby created, the said party of the second part [lessee] having kept and performed, all the covenants and conditions herein contained, on its part to be kept and performed, any machinery or fixtures, attached to the said colliery after the date of this Indenture of Lease, or erected on the demised premises by the said party of the second part, and by it paid for, may be valued by two appraisers, one to be chosen by the parties of the first part [lessors] and one to be chosen by the party of the second part, the two thus chosen to choose a third, and it shall be optional with the parties of the first part to take such machinery and fixtures at such valuation, and if not so taken by the said parties of the first part, then the party of the second part may remove the same within sixty days after such appraisement. The original lease on which the New Castle Plant was constructed provided that in certain cases of fire the lessor may "declare this lease forfeited and at an end with the same effect as though the term hereof had then expired by limitation, *87 except that the party of the second part [lessee] shall have no right to remove any of the improvements and fixtures belonging unto it * * * until the fire has first been extinguished and all claims of the party of the first part * * * have first been paid or satisfied." The New Castle Plant was carried on the balance sheets attached to petitioner's returns for the years 1930 to 1934, inclusive, as "machinery and equipment." In the notice of deficiency respondent disallowed depreciation of $99,108.10 for the year 1935 and $31,204.25 for the year 1936 with the explanation, "Excessive deduction for depreciation disallowed, because the assets acquired in previous years have been fully depreciated by allowable deductions claimed in prior years." A reasonable allowance for exhaustion, wear and tear of the New Castle Plant and the railroad siding during the years 1930 to 1934, inclusive, was five percent per annum of their respective costs. Under petitioner's contract with the Miners' Union petitioner was obliged to furnish to its miners' dynamite and miners' supplies, and to rent them mine lamps, at fixed charges to be deducted from wages payable. Petitioner's profit on these items *88 was $10,156.25 in 1935 and $9,203.84 in 1936. On each of its returns for the years 1930 to 1934, inclusive, income from the sale of dynamite and supplies and from lamp rentals was listed as an item separate from its gross receipts from the production and sale of coal. Petitioner duly elected to deduct depletion on the percentage basis for the taxable years 1935 and 1936. Respondent excluded from income from the mining report the profit derived by petitioner on selling and renting mining supplies to its employees. At the same time in computing net income from the mining property, respondent deducted as miners' wages the full amount to which they were entitled under the terms of their contracts without deduction therefrom on account of the charges made for the supplies sold or rented to the miners nor for the profit realized by petitioner on such sales and rentals. During the year 1936 petitioner constructed a certain mine tunnel at a cost of $86,394.03, thereby making available for production 394,000 tons of coal. Of the coal so made available petitioner produced and sold 5,659 tons in the year 1936. Petitioner's mine had long since passed the development stage. The proportionate *89 part of the cost of the tunnel allocable to the coal made available by the tunnel and which was produced and sold during the year 1936 was 5695/394,000, or $1,240.19. In the notice of deficiency respondent allowed petitioner percentage depletion for the year 1936 based upon income from its mining properties, which included income derived from the coal produced as a result of the construction of the tunnel. Opinion ARUNDELL, J.: The first issue raises the question of the proper amount to be allowed in each of the years 1935 and 1936 for the exhaustion, wear and tear of the two plants and the railroad siding. The reasonable allowance permitted by statute is to be computed upon the adjusted bases of the properties at the beginning of the taxable years, that is, upon their original cost plus subsequent capital additions and minus the greater of the allowed or allowable depreciation for prior years. Respondent determined that petitioner's total capital investment had been recovered in prior years through depreciation allowed or allowable. The stipulated figures disclose, however, that the unrecovered cost as of January 1, 1930, in the amount of $690,479.54, had not been entirely recouped *90 by December 31, 1934; for, while the deductions for depreciation taken on the returns for the years 1930 to 1934, inclusive, exceeded that amount, the deductions did not offset taxable income in full in each of the years, and, to the extent that they did not, the depreciation was not "allowed" within the rule of Pittsburgh Brewing Co. v. Commissioner, 107 Fed. (2d) 155, and Kennedy Laundry Co., 46 B.T.A. 70. Petitioner, therefore, is not precluded on this issue by reason of having been allowed depreciation in prior years equal to its cost. As a result, respondent's determination may be sustained only by holding that the depreciation "allowable" to petitioner during the five years 1930 to 1934, inclusive, that is, the amount it was entitled to claim, was equal to the agreed unrecovered cost of $690,479.54 at the beginning of 1930. This question, however, has been resolved in petitioner's favor as to the New Castle Plant and railroad siding by our finding of fact that the allowable depreciation thereon during the five crucial years was at the rate of five per cent, based upon the useful physical life of the properties *91 of 20 years. The dispute between the parties arose from the fact that the improvements, though they had a useful life of 20 years, were situated upon leased premises, and the leases were for a shorter period than 20 years. In fact, each of the leases expired prior to the taxable years involved. Respondent concluded from this that the useful life of the improvements was limited by the life of the leases. We think, however, that the rule of depreciating improvements over the shorter period of their usefulness or the terms of the leases has no application to the present facts. The important fact here is that upon the termination of the leases petitioner was to, and did, remain the owner of the improvements. The Darkwater lease so specified, making provision for the purchase of the Darkwater Plant by the lessors if they so desired; the New Castle lease inferentially recognized the lessee's retention of title; and the Pennsylvania cases are to the effect that, even in the absence of an express provision, property of this character remains that of the lessee. Radey v. McCurdy, et al., 209 Pa. 306, 58 Atl. 558; Robinson v. Harrison, 237 Pa. 613, 85 Atl. 879; *92 Shellar v. Shivers, et al., 171 Pa. 569, 33 Atl. 95; McClintock & Irvine Co. v. Aetna Explosives Co., 260 Pa. 191, 103 Atl. 622; Prudential Insurance Co. of America v. Kaplan, et al., 330 Pa. 33, 198 Atl. 68. Respondent on brief appears to concede that this is so. In this respect the case at bar is different from the ordinary case where title to improvements erected by the lessee vests in the lessor either at the time of their construction or upon termination of the lease. Under the latter circumstance the usefulness of the improvements to the lessee is limited by the term of the lease for if it is not renewed he loses both the use of and title to the improvements. 1620 Broadway Corporation, 36 B.T.A. 149. Similarly, in Bonwit Teller & Co. v. Commissioner, 53 Fed. (2d) 381, certiorari denied 284 U.S. 690, upon which respondent relies, the depreciable asset was the leasehold itself, which, as the court pointed out, would cease to exist upon expiration of *93 the term. Here, however, respondent recognizes that petitioner could have removed the improvements upon termination of the leases. In addition, since it still owned them, it could have (1) sold them to the lessors, or (2) sold them to a new lessee, or (3), as actually occurred, remained in possession under new or extended leases. A somewhat analogous case is Eimer & Amend, 2 B.T.A. 603, where the lessor, upon expiration of the lease, was either to grant a renewal or purchase the improvements, and it was held that the original lease was not the proper period over which to compute depreciation. We are not impressed by respondent's argument that this issue must be decided against petitioner for failure to prove that the improvements would not have been reduced to scrap if they had been removed upon termination of the leases. Of the possibilities open to petitioner as the owner of the improvements, it may not be assumed that the only one disadvantageous to petitioner would eventuate. We think it safe to assume as a practical business matter that if the lessors had declined to renew and decided to carry on production themselves or to lease to a new tenant, *94 some way would have been devised to prevent the tearing down of a plant suited to the particular premises with years of useful life remaining, and the consequent necessity of constructing a new plant. Taxation is a practical matter and in our opinion the probability that a useful plant would be scrapped may not be presumed in determining the reasonable allowance for depreciation of which the statute speaks. As a practical matter the New Castle Plant and railroad siding had a useful life to petitioner of 20 years from the time of construction, and we think there is no reasonable basis in the facts for holding that it would have been authorized or required to depreciate the assets in excess of five per cent per annum. With respect to the Darkwater Plant, however, we are unable to say that respondent erred in determining that no depreciation is allowable. It is stipulated that the plant had a useful life of 20 years from the time of construction, but we do not know when it was constructed. It was already on the leased premises when petitioner acquired them in 1922, and we must assume that the cost of this plant had been completely depreciated prior to the taxable years. The deductions *95 allowable for the taxable years may be computed under Rule 50, giving effect to the allowable depreciation for previous years and to the amounts claimed in excess thereof to the extent they offset taxable income not only of petitioner but of its affiliated companies as well. The second issue arises from petitioner's contention that in computing "net income from the property" for the purpose of the 50 per cent limitation upon percentage depletion, respondent erred in reducing gross income from the property by the amount of the gross rather than the net cost of petitioner's labor. The point made is that petitioner's labor cost was no more than the cash actually paid to the miners plus the cost to petitioner of supplies which it sold and rented to them. Petitioner objects to respondent's characterization of the difference between the cost of the supplies and the figures at which they were charged to the employees as profits in selling merchandise," insisting that the net effect was simply to reduce the cost of labor. We think petitioner's criticism is without merit. The single paragraph of the stipulation dealing with this issue refers in three different sentences to "the profit which *96 petitioner derived on selling and renting mining supplies to its employees." On its returns for the years 1930 to 1934 petitioner reported income from such sales and rentals as an item separate and distinct from coal receipts, and presumably it deducted the full wages payable in determining net income from the sale of coal. The returns for the taxable years are not in evidence, and we cannot assume in petitioner's favor that this method of reporting was changed. And, finally, at the hearing petitioner's counsel stated his contention to be "that either the profit that was made from the sale of mining supplies to the miners should be included in the income from the mining property or that the wages actually paid, which should be a deduction from the income from the property, ought only to be the net amounts * * *". On brief, however, petitioner refrains, and we think properly so, from contending that these profits should be added to the gross income from the property. Such profits cannot be distinguished from gain derived through the operation of a company store or from the leasing of tenement houses to employees. Dorothy Glenn Coal Mining Co., 38 B.T.A. 1154. *97 Profits of this nature are not "income from the property" as that phrase is used in section 114 (b) of the Revenue Acts. Nor do we think it is correct to say that the profits reduced petitioner's cost of labor. Petitioner was obligated to pay its employees a fixed amount. That it was able to satisfy a part of that liability by furnishing them supplies which had cost it less than the liability so discharged, does not mean that its total liability was any less or that it was not discharged in full. The situation is the same as if the miners had received their entire wages in cash and had then purchased the supplies either from petitioner or someone else. The short-cut of withholding does not alter the essential nature of the situation, which was, as reported on the returns, the payment of wages in full and the realization of a profit upon a distinct and separate transaction. On this issue respondent's determination is affirmed. The remaining issue is whether petitioner may deduct th cost of a tunnel over the period of the production and sale of coal made available by it. In 1936 petitioner produced and sold 5,659 tons of the 394,000 tons so made available, and seeks to deduct as a *98 deferred operating expense a proportionate part of the cost of $86,394.03, or $1,240.19. Respondent argues that the cost was capital expenditure to be recovered only through depletion, that percentage depletion based in part upon income derived from the 5,659 tons of coal has been allowed, and that to sustain petitioner in its present claim would result in the allowance of a double deduction. In effect, petitioner's method is to capitalize the expenditure over the period of the production and sale of the coal made available by the tunnel, and to secure the return of that investment by annual deductions spread over a like period. At the same time, however, petitioner, having elected percentage depletion, will secure a recovery of the same investment by depletion computed upon the income derived from such coal. Such facts as have been stipulated leave us little doubt that the expenditure was of a capital nature, and certainly there is nothing in the stipulated facts to rebut the commissioner's determination to that effect. As such the cost is to be recovered through depletion, and this it has elected to take on the percentage of income basis. We have found no provision in the revenue *99 acts or the regulations promulgated thereunder, and petitioner has cited none, that would justify the double deduction sought. Petitioner relies upon G.C.M. 13954, XIII-2 C.B.-66; but if that ruling is to be read as sanctioning what amounts to deductions for depletion of both the percentage and cost bases, we cannot agree with it. Decision will be entered under Rule 50.