ALAMO BROADCASTING COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22362. Promulgated October 20, 1950.

*Whitfield J. Collins, Esq.*, for the petitioner.
*D. Louis Bergeron, Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge:* The principal question here involves the loss claimed by petitioner on its sale of the diesel power unit. On its 1946 return, petitioner claimed a loss of $111,515.62. Its petition reduced the claimed loss to $107,715.62 and the brief further reduced it to $82,171.26.

Respondent's theory for denying petitioner any loss is that the cost basis of the diesel was not in excess of the amount received for it since, according to respondent, petitioner intended the diesel for salvage at the time it purchased the total property, including the diesel, of Mexican radio station XENT. Respondent would require petitioner to apply the amount received for the diesel in reduction of the cost basis of the XENT transmitting equipment which was removed from Mexico and placed in operation in petitioner's enlarged station at San Antonio. Alternatively, respondent asserts that if petitioner did sustain a loss, it must be held a capital loss on property which was never used in its trade or business.

The evidence does not sustain respondent's determination that petitioner had no intention of making use of the diesel at the time of purchase. We have no doubt that petitioner was primarily interested in acquiring XENT's high-powered transmitter when it negotiated for the Mexican station. But whatever the principal motivation may have been, the testimony clearly establishes that up to and beyond the date of acquisition petitioner planned to employ the XENT diesel as a source of either primary or auxiliary power at its proposed new site. Even after petitioner learned that permission had been obtained to export the XENT transmitter from Mexico but not the diesel, it continued to entertain the hope that it would later prove possible to bring out the power unit. It was only in view of the mounting caretaking and legal expenses incurred in connection with it that petitioner eventually decided in 1946 to dispose of the diesel for whatever price it could realize on an immediate sale. This proved to be a total consideration of $4,125 paid by the purchasers.

In determining the cost basis of the diesel unit and its spare parts, which were included in the sale price, we have given full weight to the relevant testimony bearing both on petitioner's expenditures for the total XENT equipment and to its method of allocation in attributing a portion of this cost to the diesel power plant. In purchasing the XENT equipment, petitioner paid a lump sum for the station as a whole, no values being assigned to the individual items of equipment

included therein. To arrive at a cost basis for the individual components, petitioner has employed percentages based on its estimates of the fair market values of the various items and has applied these percentages to the total costs incurred for the equipment as a whole. We regard this as an acceptable method of allocation, but we have made certain adjustments to petitioner's estimates of fair market values in the light of the testimony of the witnesses for both parties.

In regard to the total cost incurred by petitioner in purchasing the XENT equipment, respondent originally contested only an item of $35,000. The evidence adduced convinces us that the disputed $35,000 was actually expended by petitioner as a part of its costs incident to the acquisition of the Mexican equipment. As a result of the testimony of petitioner's witnesses, however, we have made necessary adjustments in determining the cost basis of the XENT equipment as a whole. Also, in arriving at the proper cost basis for the diesel here in issue, we have made further adjustments in segregating from the total cost those costs which were shown to be related only to the equipment removed from Mexico and similarly have segregated those costs wholly concerned with the diesel and spare parts left in Mexico. Making the requisite changes in the computation of total expenditures and in the percentages used in allocation, we have found that petitioner had a total cost basis of $196,501.15 for the XENT equipment, of which $45,240 is allocable to the cost of the diesel power unit and related spare parts. Upon the sale of this property in Mexico in July 1946, petitioner incurred a loss in the amount of $41,115.

The nature of petitioner's loss is governed by our determination that petitioner purchased the diesel with the intent of using it in its new facility. The loss properly falls within the provisions of section 117 (j) [1] as a loss incurred on the sale of property "used in the trade or business". We have previously held that "used in the trade or business" means "devoted to the trade or business" and includes property purchased with a view to its future use in the business even though this purpose is later thwarted by circumstances beyond the taxpayer's control. *Carter-Colton Cigar Co.*, 9 T. C. 219. See also *Wilson Line, Inc.*, 8 T. C. 394; *Kittredge* v. *Commissioner*, 88 Fed. (2d) 632; *Yellow Cab Co. of Pittsburgh* v. *Driscoll*, 24 F. Supp. 993; *Independent Brick Co.*, 11 B. T. A. 862.

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

*     *     *     *     *     *     *

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the

Petitioner here had no control over the decree of the President of Mexico which permitted it to bring out the XENT transmitter but not the diesel. It fully intended to use the diesel as a source of either primary or auxiliary power until it became evident that the costs of keeping a caretaker with the equipment in Mexico and of defending the lawsuits that occurred in respect to the property were rapidly consuming its investment in the property. Since petitioner could not determine when, if ever, permission might be obtained to export the diesel, it decided to dispose of it rather than incur additional expense. Although no depreciation was taken or allowed on the diesel, it nevertheless falls within the classification of property "of a character which is subject to the allowance for depreciation" within the meaning of section 117 (j). See *The P. Dougherty Co.*, 5 T. C. 791, affd., 159 Fed. (2d) 269.

On the issue presented by respondent's determination that petitioner should depreciate the XENT transmitting equipment over a 6-year period instead of the 4-year period claimed by petitioner, we hold that petitioner has fully met its burden of proof and has shown to our satisfaction that the economic useful life of this equipment was not in excess of 4 years.[2] One of petitioner's radio engineers testified that the XENT transmitter was already obsolete at the date petitioner acquired it. The transmitter required 3 months of overhauling to meet F. C. C. standards and even after such a re-working was still deemed by petitioner so obsolete as to justify its replacement with a new factory built transmitter when wartime restrictions were lifted. Such a replacement was actually made in 1949 and the XENT transmitter was then disposed of for its salvage value as junk.

On the question of whether petitioner may depreciate the building and antenna and ground system which it erected on its leased transmitter site over the primary term of the lease or the shorter of either the total lease period including renewal or the useful life of the improvements, we uphold respondent's determination. Respondent's Regulations 111, section 29.23 (a)–10, provide in pertinent part as follows:

SEC. 29.23 (a)–10. Rentals.—* * * The cost borne by a lessee in erecting buildings or making permanent improvements on ground of which he is lessee is

taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.
* * * * * * *
SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions :
* * * * * * *
(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
(1) of property used in the trade or business, or
(2) of property held for the production of income. * * *
[2] See Section 23 (1), Internal Revenue Code, *supra*, n. 1; see also Regulations 111, section 29.23(1)–6.

held to be a capital investment and not deductible as a business expense. In order to return to such taxpayer his investment of capital, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining of the term of lease, and such deduction shall be in lieu of a deduction for depreciation. If the remainder of the term of lease is greater than the probable life of the buildings erected, or of the improvements made, this deduction shall take the form of an allowance for depreciation.

In cases in which the lease contains an unexercised option of renewal, the matter of spreading such depreciation or amortization over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular case. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease or the cost of improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal. * * * If, in any case, the life of the improvements is less than the number of years the lease has to run, including the renewal period if properly to be considered, the deduction for depreciation with respect to such improvements shall be spread only over such life.

We have previously recognized the validity of the above Regulations. *Morris Nachman*, 12 T. C. 1204; *Standard Tube Co.*, 6 T. C. 950. Mertens, in his Law of Federal Income Taxation, has stated the rule as follows:

§ 23.93—Where the Lease Provides for Renewal. Where the lease has a definite fixed life, the property reverting to the lessor at its expiration or losing its usefulness at that time, exhaustion will be prorated over the life of the lease. Where, however, the lessee has an option to renew on the same terms, the exhaustion should be spread over the combined period named in the lease and the renewal period, or the life of the property, whichever is shorter.

This rule is said to be subject to two exceptions: (1) where the renewal option provides that the rental for the renewal period is to be based upon a reappraisal of the property, and (2) where it is apparent that the parties will not exercise the right to renew or where it is apparent that the right to renew will be worthless. In such cases the period of exhaustion is limited to the original term of the lease. Here, the lease provides that petitioner as lessee has the right at any time to remove from the premises all buildings and fixtures which it has placed thereon, provided the rent is not then in default. It also provides that at the termination of the lease petitioner has a similar right to remove all buildings and fixtures from the property. It is thus apparent that the property will not revert to the lessor at the expiration of the original term as was the case in *1620 Broadway Corp.*, 36 B. T. A. 149.

The lease also provides for renewal at the same rental so that no question arises of the renewal option requiring a reappraisal of the property as in *Bonwit-Teller & Co.*, 53 Fed. (2d) 381, cert. denied, 284 U. S. 690. There is no evidence that the parties to the lease had

definitely determined not to renew the lease in the taxable year or that the renewal option would be worthless to petitioner at the expiration of the original term. When petitioner expended on improvements on the leasehold property an aggregate of $119,858.29 as of the taxable year here in issue, it appears unlikely that it would abandon this investment at the expiration of the original term of the lease, especially since the lease can be renewed without increase in rent. We have taken into account the testimony of petitioner's officers who said that they were uncertain at the time of the execution of the lease whether they would renew it in the light of possible future competition from FM and television stations. We regard this testimony, however, as an expression only of the threat of competition, which is present to a greater or lesser extent in all business activity and do not regard it as an expression by petitioner that it had decided not to renew the lease at the expiration of its present term.

Under the facts here present, we hold that the leasehold improvements should be depreciated over the combined period of the original term of the lease plus the renewal period or the useful life of the improvements, whichever is shorter. See *East Kauai Water Co., Ltd.,* 11 T. C. 1014. Respondent's determination in this respect is therefore approved.

*Decision will be entered under Rule 50.*