OPINION. Turner, Judge: The first question is as to the amount to be included in equity invested capital for good will. . By section 718 (a) (2) of the. Internal Revenue Code,[2] it is provided that property paid in for stock, or as paid-in surplus, or as a contribution to capital, shall be included in equity invested capital “in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange.” The parties are in agreement that good will was acquired by petitioner in a consolidation within the meaning, of section 112 (g) (1) of the Code,[3] and under section 113 (a) (7) (B), its basis for determining loss was the same as it was in the hands of the transferor, Hens & Kelly Company. The parties are also agreed that Hens & Kelly Company acquired good will on December 31,1909, when it acquired or succeeded to the assets and business of The Hens-Kelly Company. In such circumstances, the property having been acquired prior to March 1,1913, its basis to Hens & Kelly Company for determining loss was its cost. Maltine Co., 5 T. C. 1265. The petitioner claims that $400,000 is the amount to be included in its equity invested capital for good will, while the respondent contends that the amount to be included does not exceed $68,322.10. The claim of the petitioner rests upon the proposition that Hens & Kelly Company acquired the good will of its predecessor, The Hens-Kelly Company, in exchange for its 4,000 shares of common stock; and while we are unable to find on the evidence and from the stipulated facts that the 4,000 shares of common stock were issued for good will alone, the respondent, on brief, has indicated an apparent willingness to submit the issue on that basis. The issue will accordingly be decided on the assumption that the 4,000 shares of common stock of Hens & Kelly Company were issued in exchange for the good will of The Hens-Kelly Company. The cost to a corporation of property acquired through the issuance of its capital stock is the fair market value of such stock on the date, issued. Where, however, the fair market value of the stock is not established as of the date of issue, it is proper to consider the fair market value of the property received, in arriving at the fair market value of the stock. Ida L. McKinney, 32 B. T. A. 450, 456. Among other things, the petitioner, in support of its claimed cost of $400,000 for good will, relies upon the established position of The Hens-Kelly Company Department Store in the city of Buffalo and its physical location in that city; the individual standing of both Hens and Kelly in Buffalo and in the department store business; the fact that the directors of Hens & Kelly Company, at their first meeting, indicated in the whereas clause of a resolution that they regarded the business and property acquired as being “reasonably worth the amount of the consideration” paid therefor; the fact that Clawson and Knox, men of considerable wealth and standing in the mercantile business in Buffalo, were coming into the business as shareholders; and the fact that Hens & Kelly Company, after its organization and for a period of 10 years, did operate at a satisfactory profit, during which period it paid the dividends due on its preferred stock for all years and for most of such years very satisfactory dividends on its common stock. The respondent stresses the condition of The Hens-Kelly Company at and for some time prior to the date of acquisition of its business and assets by Hens & Kelly Company and arrives at $68,822.10 as the amount to be included in equity invested capital for good will from the testimony of two witnesses called by him to give opinion testimony. "While we think the record does show that Hens & Kelly Company in acquiring the business and assets of The Hens-Kelly Company did acquire good will, we are nevertheless of the opinion that the record falls far short of supporting the claim that the good will acquired had a fair market value of $400,000 at the time of acquisition, or that its cost to petitioner was such sum. It is true that the directors of Hens & Kelly Company, at their first meeting, did in the whereas clause of a resolution state that in their judgment the business and property acquired for stock was reasonably worth the consideration paid therefor, but it is likewise true that the $400,000 figure for good will was a carry-over figure from the books of The Hens-Kelly Company. We have no information as to when good will was set up on the books of The Hens-Kelly Company, what the considerations were for setting it up, or how the $400,000 figure used was arrived at. We do know, however, that prior to the organization of Hens & Kelly Company the credit of The Hens-Kelly Company was not good and had to be reestablished if it was to obtain merchandise needed for profitable operations, and, according to Knox and Clawson, who were looking the business over to see whether they would participate in it, changes in its methods of operations needed to be made and the business needed to be upgraded from the lower class or “shawl” trade into the so called “medium” class trade. In arriving at the figure of $400,000, the petitioner rests its argument very heavily upon the participation of Knox and Clawson, and it is true that they did arrange for a line of bank credit for The Hens-Kelly Company about the middle of 1908 and for a trial period prior to December 31,1909, did participate in policy determination. There is no showing, however, that they acquired any proprietary interest in the business before the organization of Hens & Kelly Company and its succession to and acquisition of the assets and business of the old company. It is obvious, we think, that whatever the effect of their participation in the affairs of the business, the effect was prospective and not a part of the good will acquired by Hens & Kelly Company for its common stock. Possibly what the petitioner has in mind is that the participation of Knox and Clawson did serve to enhance the value of the common stock issued for the good will, and possibly it did prospectively enhance the value of such stock to some extent. There were no shown sales, however, of the Hens & Kelly Company common stock at any time and we have no direct evidence showing its fair market value at the time of issue. We do know that Knox and Clawson did acquire some of the common stock at some time and in some manner. Presumably they became equal holders of such stock with Hens and Kelly themselves. Except, however, for the preferred stock later sold to 150 separate individuals and the 40 shares of common stock subscribed for by the incorporators, all of the preferred stock issued and the common stock, 3,960 shares, were issued to The Hens-Kelly Company for its business and assets, and in ordinary course would thereafter have been distributed to the stockholders of that company. There is, therefore; nothing to show that either Knox or Clawson, upon the organization of Hens & Kelly Company and the acquisition by it of the business and assets of The Hens-Kelly Company, put any money into the business. So far as appears of record, their acquisition of stock was through a side transaction with Hens and Kelly individually or The Hens-Kelly Company. What they paid, if, in fact, they paid anything, for the common stock acquired by them, we do not know. Where, as in such circumstances, the transaction was obviously at arm’s length, evidence as to the cost to Knox and Clawson of the common stock acquired by them, which stock presumably was acquired immediately after its issue for good will, would have been much more revealing as to the fair market value of the common stock of Hens & Kelly Company at the time of issue, than the indirect evidence upon which the petitioner relies. Having considered all of the evidence of record and given effect thereto as best we could, we have concluded and found that the cost of the good will acquired by Hens & Kelly Company from The Hens-Kelly Company was $100,000. The second issue is whether the petitioner for the years ended January 31, 1941 to 1944, inclusive, is entitled to amortize the unre-covered cost of leasehold improvements over the period from April 1, 1940, to May 1, 1962, without regard to petitioner’s option to extend the lease to May 1, 1982. This question is governed by section 29.28 (a)-10 of Regulations 111, which reads in part as follows: Rentals. — * * * The cost borne by a lessee in erecting buildings or making permanent improvements of ground of which he is lessee is held to be a capital investment and not deductible as a business expense. In order to return to such taxpayer his investment of capital, an annual deduction may be made from gross income of an amount equal to the cost of such improvements divided by the number of years remaining of the lease, and such deduction shall be in lieu of a deduction for depreciation. * * * In cases in which the lease contains an unexercised option of renewal, the matter of spreading such depreciation or amortization over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular, case. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease or the cost of improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal. However, if the taxpayer for any taxable year ending prior to December 31, 1939, has been allowed such depreciation or amortization on the basis of spreading the cost or other basis of such lease or improvements over the number of years the lease has to run, including any exercised or unexercised renewal period or periods, and such taxable year has been closed on that basis and the tax for that year cannot be redetermined, then the taxpayer may for subsequent taxable years take deductions on such basis if within 90 days after the approval of Treasury Decision 4957 (approved December 6, 1939) or within such later period as may be specified by the Commissioner, he files Form 969, in duplicate, with the Commissioner of Internal Revenue, Washington, D. C., attention of the Income Tax Unit, Records Division, signifying his election to have deductions in respect of such items determined upon such basis, and expressly waives his right to claim or receive the benefits of any reduction in his tax liability which would result from the allowance of deductions for such items on the basis of only the number of years the lease has to run, without taking into account any right of renewal, or on any basis other than that set forth in his election. * * * It is the claim of the petitioner that amortization of the unrecovered cost of the leasehold improvements is to be limited to the original lease period ending May 1, 1962, and in support of that contention, it cites and relies upon Bonwit Teller & Co. v. Commissioner, 53 F. 2d 381; 719 Fifth Avenue Co. v. United States, (1934 Ct. Cl.) 5 F. Supp. 909; 1620 Broadway Corporation, 36 B. T. A. 149; Estate of George B. Leonard Holding Corporation, 26 B. T. A. 46; and Bowman Hotel Corporation, 24 B. T. A. 1139. It stresses particularly the fact that, in the event of renewal of the lease for the period from May 1, 1962, to May 1, 1982, the annual rental for the extended period was to be $60,000, or 6 per cent of the appraised value of the property at the renewal date, whichever should be the greater, and cites Alamo Broadcasting Co., 15 T. C. 534, for the proposition that where the renewal is to be based upon a reappraisal of the property, the period of amortization is limited to the original term of the lease. It is to be noted that the regulation quoted above provides that the matter of spreading amortization over the term of the original lease, together with the renewal period or periods, “depends upon the facts in the particular case,” the general rule being, however, that “unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease or the cost of improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal.” The petitioner makes no contention that the regulation is unreasonable or otherwise invalid, but, accepting the regulation, argues that on the evidence there was no reasonable certainty in the taxable years that the lease would be extended beyond May 1, 1962. The question, then, is one of fact. On its returns the petitioner computed and claimed amortization of the leasehold improvements on the basis that its lease would be extended to May 1, 1982. The respondent in his determination of the deficiencies herein, accepted that computation and claim as correct. The burden is accordingly upon the petitioner to show that in the taxable years there was no reasonable certainty that its lease would be extended beyond May 1,1962. From 1922, when the leases to the premises occupied were renegotiated by Hens & Kelly Company and the renovating, remodeling or construction of its present store building began, up to May of 1948, when the first amended petition herein was filed, there was, in so far as shown of record, no thought whatever on the part of the petitioner or its predecessor, Hens & Kelly Company, but that the lease or leases would be renewed to May 1,1982, the full period provided for. From 1922, until it was consolidated with S H Company, Inc., on April 1, 1940, to form the petitioner, Hens & Kelly Company amortized the leasehold improvements on the basis of the original term of the lease, plus- the two renewal periods to 1982. Those leases, like the lease here, provided that in the event of renewal one of the factors in determining the rental for the extended period was to be the appraised value of the premises at the renewal date. After the petitioner was formed, it likewise computed and claimed amortization of the leasehold improvements for the entire period up to 1982. It is also apparent, we think, that the claims made by the petitioner after it was organized, including the taxable years, were advisedly made. Treasury Decision 4957, later section 29.23 (a)-10 of Regulations 111, supra, was issued on December 6, 1939. Under its provisions, a taxpayer which, for any taxable period ending prior to December 31, 1939, had been allowed amortization on the basis of spreading the cost of leasehold improvements over the years the lease was to run, plus any exercised or unexercised renewal period or periods, and which desired to continue to amortize leasehold improvements in subsequent years on that basis, was required to file an election to the effect within 90 days. Under date of March 12, 1940, and after the 90-day period had expired, Hens & Kelly Company transmitted to the respondent such formal election to continue to amortize its leasehold improvements over both the original lease period and the renewal period. This formal election was transmitted by a letter signed by Arthur P. Wesp, vice president of Hens & Kelly Company, which letter indicated that Wesp and other officers of the company were fully informed as to the provisions of Treasury Decision 4957, and the requirements thereunder. At the time the election was filed with the respondent, it was known that Hens & Kelly Company was to be consolidated with S H Company, Inc., to form the petitioner. In the letter of transmittal it was stated that T. D. 4957 did not come to the attention of the officers of the company until March 6, 1940 ‘"Due probably to the preoccupation of all of the interested parties in the financing program now being effected by this company.” The consolidation with S H Company, Inc., was effected some eighteen or nineteen days later, and Arthur Wesp became the president of the petitioner. At or about the time the above election was filed with the respondent by Hens & Kelly Company, a single new lease was being negotiated on behalf of the petitioner to cover the remainder of the lease period, plus the renewal period up to May 1, 1982, and the new single lease was obtained at a substantially reduced minimum rental. After its organization on April 1, 1940, the petitioner, in returns signed by Wesp, as its president, continued to claim deductions for amortization of the leasehold improvements over the original lease period, plus the renewal period up to May 1, 1982, just as had been done by its predecessor, Hens & Kelly Company. On such state of facts, we think it apparent that the petitioner itself, and its predecessor, Hens & Kelly Company, regarded the renewal of the 1922 leases and after they were superseded by the single lease in 1940, the 1940 lease up to May 1,1982, as a reasonable certainty. Such a consistent attitude on the part of the petitioner and its predecessor speaks much more loudly in favor of a reasonable certainty of renewal, than does the fact that the renewal at May 1, 1962, would be based on an appraisal of the, property at that time and might, for that reason, result in a greater annual rental, speak against reasonable certainty of renewal. Not only are we of the opinion that the petitioner has failed to carry its burden of proving that during the taxable years there was no reasonable certainty that the lease to the premises occupied by it would not be renewed at May 1, 1962, for the extended period, but, to the contrary, we think the evidence amply shows that there was reasonable certainty that the lease would be renewed, and we have so found as a fact. In reaching the above conclusion, we have not overlooked the arguments advanced by the petitioner on the basis of testimony appearing of record and relied upon as raising doubts as to the reasonable certainty that the lease would be renewed. The fact that traffic in downtown Buffalo was becoming more congested and parking facilities were inadequate and that there was a noticeable trend toward the establishment of suburban branches by downtown department stores, is not, in our opinion, an indication that the petitioner had any thought or intention of giving up its downtown location, but merely that it might seek to further expand its business by the establishment of suburban branches. By the time of the trial, one such branch had been established and another was in the planning stage, but they were specifically referred to as “branches” and there was still nothing to indicate the presence of any thought or intention of abandoning the main store or of changing its location. It is interesting to note that on this point the evidence relied upon by the petitioner is the testimony of Wesp, who had played such a part in the claims by Hens & Kelly Company, and later the petitioner, for extending amortization of the leasehold improvements to 1982, and the testimony of Beinecke, who had represented Sperry & Hutchinson Company in the 1940 consolidation and substantially dominated the management of the petitioner thereafter, and who, although he had insisted that more favorable leases be negotiated, had based his recommenda- ' tion favoring participation by Sperry & Hutchinson Company in the 1940 reorganization on the good name of the store in Buffalo and its “good location.” Because of his participation in the reorganization and his part thereafter in determining policy for the petitioner, it is not at all unlikely that Beinecke was aware of T. D. 4957, the election of Hens & Kelly Company thereunder, and the basis of petitioner’s claims as to the amortization of leasehold improvements over the entire period to 1982. The testimony of these witnesses was, we think, largely hindsight in character. We have found the facts as they existed at the time here involved and the action then taken thereon much more convincing. In that connection, see and compare 1620 Broadway Corporation, supra. The respondent’s regulation applicable to the years involved in Bonwit Teller & Co. v. Commissioner, supra, provided for an annual deduction to cover amortization of the cost of leasehold improvements in “an amount equal to the total cost of such improvements divided by the number of years remaining of the term of lease.” There was no provision, such as we have here, permitting the spreading of depreciation or amortization over the term of the original lease, together with the renewal period or periods. Accordingly, the court had no occasion to consider the reasonableness of a regulation which does permit tbe spreading of amortization over the original lease period, plus the renewal period, where, as here, “the facts show with reasonable certainty that the lease will be renewed.” See Morris Nachman, 12 T. C. 1204, 1209. Furthermore, the petitioner here does not claim that the present regulation is unreasonable or invalid, but seemingly accepts the regulation and argues that there was no reasonable certainty that the lease would be renewed. We have already noted our finding of fact to the contrary. For cases where there was reasonable certainty of renewal, see Standard Tube Co., 6 T. C. 950, and Alamo Broadcasting Co., supra. It is true that in the latter case the situation where renewal of a lease is based upon a reappraisal of the property is referred to as an exception to the proposition stated by Mertens in his Law of Federal Income Taxation, that where “the lessee has an option to renew on the same terms, the exhaustion should be spread over the combined period named in the lease and the renewal period or the life of the property, whichever is shorter.” Alamo Broadcasting Co., however, was a case where the option was an option to renew on the same terms and is not authority for the proposition that leasehold improvements may not be spread over the term of the original lease, plus the renewal period, even though the renewal is based on reappraisal, if the facts of the particular case support the conclusion that there is reasonable certainty of renewal. It is manifest, of course, that the statement appearing in Mertens is merely that of a digester’s views as to what certain decided cases hold. It may not properly be regarded as controlling authority for the decision of this or any other case and it was not so cited in Alamo Broadcasting Co. Futhermore, all of the cases shown in the footnote in support of the proposition stated involved years, and were decided prior to the promulgation of the regulation applicable in the instant case. A short time before the trial herein the petitioner, in a third amended petition, made a vague and general allegation to the effect that the respondent “erred in failing to compute properly the amount paid in for stock of the petitioner, or as paid-in surplus, or as a contribution to capital of the petitioner in connection with the organization of the petitioner.” There were, however, no supporting allegations of fact. When the proceeding was called for trial, counsel for the petitioner made no reference to or statement of such an issue, unless the words “In connection with fiscal 1943 and fiscal 1944 there is another issue raised, which is simply a matter of Rule 50” was with reference thereto. On brief, however, the petitioner has entered into some rather extended discussion as to the applicability of section 760 of the Internal Revenue Code. The argument is not clear, and there again, the assertion is made that the “issue will not become material until computation is made under Rule 50 of the Tax Court’s Eules of Practice.” On such state of the record, we think it apparent that no issue, whatever petitioner’s counsel may have had in mind, was properly raised and presented for decision by this Court, and as to any such issue, we leave the parties where we found them. Eeviewed by the Court. Decision will be entered under Bule 50. SEC. 718. EQUITY INVESTED CAPITAL. (a) Definition. — The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)— (2) Property Paid In. — Property (other than money)- previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined under the law applicable to the year of disposition, but without regard to the value of the property as of March 1, 1913. * * * SEC. 112. RECOGNITION OF GAIN OR LOSS. **•**•• (g) Definition of Reorganization. — As used in this section (other than subsection (b) (10) and subsection (1).) and in section 113 (other than subsection (a) 22))— (1) The term “reorganization” means (A) a statutory merger or consolidation, * * *