UMCO CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
UMCO Corp. v. Commissioner
Docket No. 6891-71
United States Tax Court
T.C. Memo 1973-218; 1973 Tax Ct. Memo LEXIS 68; 32 T.C.M. (CCH) 1009; T.C.M. (RIA) 73218; October 4, 1973, Filed Donald O. Russell, for the petitioner. Charles Lock, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Fiscal Year Ended
Deficiency November 30, 1967
$ 9,222.72
November 30, 1968
24,008.97
TOTAL
$33,231.69
The sole issue remaining [1] is the fair market value on 2 May 1, 1967, of certain machinery, equipment, jigs, dies, molds and patterns used by petitioner in its business. FINDINGS OF FACT Some of the facts have been stipulated and are found *70 accordingly. Petitioner, Umco Corporation, was incorporated in Minnesota on April 11, 1967, and maintained its principal place of business at Watertown, Minnesota. Petitioner timely filed Federal income tax returns for its fiscal years ended November 30, 1967 and 1968 with the district director of internal revenue at St. Paul, Minnesota. In 1947 Warren Erickson and Gordon Tessmer formed a partnership (later incorporated) known as Umco (the partnership and its successor corporation being referred to herein as "Old Umco"), which engaged in the business of designing, developing, fabricating and marketing aluminum and plastic fishing tackle boxes. Old Umco, one of the nation's leading manufacturers of fishing tackle boxes, distributed and sold its products under the Umco label throughout the United States and Canada. Old Umco advertised its products nationally in many sporting magazines, 3 and dealers were aided and encouraged to promote Umco fishing tackle boxes locally. Old Umco's business greatly increased in size from 1947, when Erickson and Tessmer produced one model of fishing tackle box, until 1967 when Old Umco had around 60 employees producing approximately 47 different *71 models. Old Umco required machines, equipment, jigs, dies, molds and patterns to manufacture its various models and sizes of fishing tackle boxes. In 1967 Old Umco had approximately 90 different pieces of machinery and approximately 286 different tools and dies. Atlas Plastics Corporation (hereinafter "Atlas") is an extruder of plastics, and a major supplier of the kind of plastics used in Old Umco's fishing tackle boxes. However, Atlas never was able to sell its plastics to Old Umco. Charles N. Harris, chairman of Atlas' board of directors, learned that Old Umco was for sale when he read an advertisement to that effect in the Wall Street Journal. Atlas immediately became interested in acquiring Old Umco, primarily to obtain it as a customer. On April 3, 1967, Charles N. Harris, David A. Pettigrew and M. L. Christensen, all officers of Atlas and acting on its behalf, entered into an agreement with Old Umco, Tessmer, and Erickson to acquire all Old Umco's assets for a net purchase price of $850,000. 4 The purchase agreement provided in part that, in consideration for $10,000 of that purchase price, Erickson and Tessmer agreed not to manufacture fishing tackle boxes for *72 five years beginning May 1, 1967. The assets purchased and the liabilities assumed, as set forth in the purchase agreement, were as follows: Cash on Hand and in Bank
$ 88,166.71
Accounts Receivable
$374,600.21
Less: Reserve for Bad Debts
5,500.00
369,100.21
Inventory: Finished Goods
10,984.29
Inventory: Work in Progress
35,207,86
Inventory: Raw Materials
79,258.94
Prepaid Insurance and Rent
9,865.28
Machinery, Equipment, Jigs, Dies, Molds, Patterns
434,213.40
Furniture and Fixtures
7,000.00
Automobiles
5,000.00
Leasehold Improvements
12,000.00
Land
2,000.00
Goodwill, Name UMCO, Trademarks, Patents, etc.
10,000.00
Covenant Not to Compete
10,000.00
$1,072,796.69
Less: Liabilities Assumed
Note Payable - Northwest National Bank
$100,000.00
Accounts Payable - Trade
39,411.79
Accrued Wages
1,068.00
Accrued Commissions
47,949.78
Accrued Payroll Taxes and Property Taxes
4,127.48
Accrued Interest
520.84
Accounts Payable - Gordon Tessmer and Warren Erickson, Trustees for UMCO Corporation (Income Taxes, Less Claim for Tax Refunds and Amounts Due from Officers)
29,718.80
222,796.69
NET PURCHASE PRICE
$850,000.00
*73 After Atlas purchased the assets of Old Umco, on April 5 11, 1967 it formed petitioner (its wholly-owned subsidiary) to which it assigned Old Umco's assets and liabilities. Thereafter petitioner continued Old Umco's business. On its tax returns for its fiscal years ended November 30, 1967 and 1968, petitioner reported its cost basis for depreciation of its machinery, tools and dies as $434,213.40. Respondent determined that petitioner's cost basis for these assets was only $102,150, and that $342,063.40 was the cost basis of purchased goodwill (rather than $10,000 as set forth in the agreement). As a result, respondent disallowed petitioner $19,370.26 depreciation for fiscal 1967 and $33,206.34 for fiscal 1968. ULTIMATE FINDING OF FACT The cost of petitioner's machinery, tools and dies was $240,000. OPINION The issue to be decided is the basis to petitioner, for depreciation purposes, [2] of its machinery, tools and dies used in its manufacturing business. Petitioner acquired these 6 assets from its parent Atlas, presumably in a tax-free exchange under section 351. *74 Therefore, the basis of these assets in petitioner's hands is the same as it was in Atlas' hands. Section 362(a). Atlas acquired these assets from Old Umco at the time it purchased all Old Umco's assets. Neither party has suggested that the total purchase price paid for all Old Umco's assets less its liabilities was other than the fair market value thereof, i.e., Atlas neither obtained a bargain purchase nor paid an inflated price. Therefore, the total purchase price is allocable among the assets acquired on the basis of their fair market value. Philadelphia Steel & Iron Corp. v. Commissioner, 344 F.2d 964 (C.A. 3, 1965), affirming per curiam a Memorandum Opinion of this Court; [3]Alamo Broadcasting Co., 15 T.C. 534, 540-542 (1950); Searles Real Estate Trust, 25 B.T.A. 1115, 1116-1118 (1932). So here the parties agree that the basis of the machinery, tools and dies is their cost, and that the cost of these items was their fair market value on May 1, 1967. [4]
*75 7 Petitioner claims, however, that the fair market value of the machinery, tools and dies was fixed by bona fide arm's-length negotiations between the buyer and the seller, and that under these circumstances the Court may not look behind the purchase-price allocation set in the agreement. It is true that in cases involving the allocation of a purchase price between a covenant not to compete and goodwill, we have held that strong proof is required to overcome the literal terms of the agreement, where buyer and seller bargained against a backdrop of conflicting tax interests. J. Leonard Schmitz, 51 T.C. 306, 315-322 (1968), affirmed sub nom. Throndson v. Commissioner, 457 F.2d 1022 (C.A. 9, 1963). In such cases, it is usually in the buyer's interest to allocate heavily to the covenant not to compete, which he may amortize, and lightly to the non-amortizable goodwill, while the seller usually prefers to allocate heavily to goodwill, a capital asset, and lightly to the covenant, payment for which is ordinary income. But a prerequisite for application of the *76 "strong proof" rule is the conflicting tax interests.Whether such a rule would be applied in situations other than the covenant not to compete-goodwill allocation cases where conflicting tax interests exist need not be decided here, for in this case there is no showing of any such tax conflict. The seller's capital gain would be no less here if respondent's valuation were applied to the machinery, tools and dies, and no greater if petitioner's 8 valuation were applied. [5] Therefore, the burden of proof is upon the petitioner to establish what part of the purchase price is allocable to the various assets purchased, and this Court is not bound to accept the parties' allocation set forth in the purchase agreement. F. & D. Rentals, Inc. v. Commissioner, 365 F.2d 34 (C.A. 7, 1966), affirming 44 T.C. 335 (1965), certiorari denied 385 U.S. 1004 (1967); Philadelphia Steel & Iron Corp. v. Commissioner, supra; Kunz v. Commissioner, 333 F.2d 556 (C.A. 6, 1964), affirming per curiam a Memorandum Opinion of this Court; and Copperhead Coal Co. v. Commissioner, 272 F.2d 45 *77 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court. After considering all the facts, we have reached our own conclusion on the fair market value of the assets in issue, as set forth below. Respondent in its determination contended that the fair market value of the machinery, tools and dies was $102,150. At trial respondent relied on the report and testimony of an expert appraiser, Peter Patchin, which concluded that the machinery had a fair market value of $103,356 and the tools and dies a fair market value of $75,906. Patchin personally appraised the machinery in issue, but, it developed at trial, the entire appraisal of the tools and dies was made by Patchin's assistant, Wayne Nelson, who was 9 not present and did not testify at trial. In Montgomery Bros. & Co., 5 B.T.A. 258 (1926), the taxpayer offered as evidence of the value of the property there in issue an appraisal report which purported to show the replacement cost new of all the property in issue, less depreciation sustained as shown by the appearance and condition of the property. *78 The appraisal report "was made by two persons, one of whom made an inspection of the property, determined the amount and quality of materials, the estimated hours of labor used in the erection or construction of the assets, and other data, upon the basis of which another person in the office of the appraisal company could make calculations based on the current price of materials and labor and arrive at an estimated cost of the property if it had been constructed at that time. The person who prepared the estimates of the quantity and quality of materials required and the condition of the buildings when examined did not appear as a witness, nor was any witness able to testify as to the identity of such person. The testimony of the witness who made the estimates of the replacement costs was based entirely upon the assumption of the correctness and accuracy of the data furnished him by the person who made the inspection of the assets." (5 B.T.A. at 259-260.) The Court concluded that "the appraisal report, made 10 as above stated, in the absence of the testimony of the person who prepared an essential part thereof, is not admissible in evidence. In so far as certain *79 material facts are concerned, the report is merely an ex parte statement by a person who was unidentified and who was not subject to cross examination by opposing counsel. Even if the appraisal were admitted in evidence, we are of the opinion that it would be of little value for the purpose for which it was offered." (5 B.T.A. at 260.) In this case, Nelson not only made the physical inspection of the tools and dies, but he also calculated the replacement cost of each tool and die and developed the depreciation formula to be applied to all the tools and dies as a group. We hold that the part of respondent's report prepared by Nelson is inadmissible hearsay. Montgomery Bros. & Co., supra.
The valuation method relied upon by the parties was replacement cost less accrued depreciation, an acceptable method particularly where, as here, comparable sales are unavailable. Northern Natural Gas Co. v. United States, 470 F.2d 1107 (C.A. 8, 1973), certiorari denied - U.S. - (June 11, 1973). Patchin, respondent's expert, personally inspected petitioner's purchased machinery, working from a list supplied him by petitioner. He also took into consideration *80 machinery sold subsequent to the valuation date (May 1, 1967) 11 and prior to his inspection. He determined the replacement costs less accrued depreciation on each piece of machinery, and added 15 percent for engineering and designing fees for plant layout. He concluded that the fair market value of petitioner's machinery as of May 1, 1967, was $103,356. We were impressed with this witness's testimony and his qualifications to do this appraisal. As noted above, respondent's expert evidence with respect to the value of the tools and dies has been excluded. Otis Haskett, one of petitioner's experts, has had years of experience in the development and purchase of tools and dies. He evaluated the machinery, tools and dies for Atlas prior to Atlas' purchase of Old Umco's assets. He is an acquaintance of M. L. Christensen, president of Atlas, and made both the previous appraisal and his appraisal at trial without charge. Haskett inspected the machinery, tools and dies at the plant, and also inspected the end product produced by these machines, tools and dies. He found this equipment in good condition. In making his evaluation he considered replacement cost and the condition *81 (that is wear and tear) of the machinery, tools and dies at the time of the sale. He valued the machinery at $200,000 and the tools and dies at $300,000, plus or minus 10 per cent. 12 William Hogan, another of petitioner's valuation experts, worked for Old Umco and presently works for petitioner. He estimated the machinery, tools and dies together to be worth approximately $500,000, based on replacement cost (without regard to depreciation). He noted that approximately 25 percent of the tools and dies purchased were back-up equipment, used only in case of emergency. Much of this equipment has never been used by petitioner. Warren Erickson, the last of petitioner's experts and one of the two founders and sellers of Old Umco, said he valued the machinery, tools and dies at $490,000. Again, he did not take depreciation into consideration in valuing these assets; his figure represents his estimate of the cost to replace this equipment. We have carefully considered all the admissible evidence presented to us. No useful purpose would be served by reviewing in detail that evidence or in what particulars we agree or disagree with the numerous judgment factors the experts *82 took into account in reaching their conclusions. Valuation is not susceptible to a precisely accurate determination. Using our best judgment on all the evidence before us, we conclude that the fair market value of the machinery on May 1, 1967, was $105,000 and the fair market value of the tools and dies was then $135,000, or a total of $240,000. Decision will be entered under Rule 50. Footnotes
1. The parties stipulated that petitioner is entitled to a $10,507.26 deduction for a reasonable addition to its bad debt reserve for the taxable year ended November 30, 1968. Petitioner conceded at trial that the allowable investment credits for the taxable years ended November 30, 1967 and 1968 are $4,674.46 and $5,714.47, respectively. ↩
2. Section 167(g) provides that basis for depreciation shall be adjusted basis for determining gain or loss. Adjusted basis for determining gain or loss is cost, unless otherwise provided in Code sections 1011 and 1012. All Code references in this opinion and the footnotes are to the Internal Revenue Code of 1954, as in effect during the years in issue. ↩
3. T.C. Memo. 1964-93↩. 4. The correct valuation date appears to be April 3, 1967, but there is no indication in the record that this makes any measurable difference. Both parties' appraisers used a May 1, 1967 date. ↩
5. In either case, the seller's gain would exceed the maximum depreciation recapture under section 1245. ↩