RICHARD M. JACKSON and HELEN B. JACKSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jackson v. Commissioner
Docket No. 8742-73.
United States Tax Court
T.C. Memo 1975-265; 1975 Tax Ct. Memo LEXIS 108; 34 T.C.M. (CCH) 1139; T.C.M. (RIA) 750265; August 14, 1975, Filed William P. Shannahan, for the petitioners. Jeffrey C. Kahn, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency of $4,320 in petitioners' income tax for the calendar year 1968. At issue is whether a loss sustained in 1968 upon the sale of certain real property must be treated as a capital loss subject *109 to the limitations of section 1211(b), I.R.C. 1954. FINDINGS OF FACT The parties have filed a stipulation of facts along with exhibits which is incorporated herein by this reference. Petitioners, husband and wife, resided in California at the time they filed their petition herein. Helen B. Jackson is a party to this proceeding only by reason of having filed a joint return with her husband (hereinafter referred to as "petitioner"). Since graduating from college in the mid-1930's petitioner has engaged in the general contracting business, individually, as a partner, and through closely held corporations. General contracting, as practiced by petitioner, has included building commercial and residential structures for clients under contracts, and on occasion acquiring land and building homes or other improvement thereon for sale to the general public. Petitioner first entered into this occupation with an experienced contractor named Hayes. Following Hayes' death a few years later, petitioner obtained his own general contractor's license from the State of California and began doing business as a sole proprietor. In the course of this business, petitioner met someone named Scott, *110 then an employee of Dixie Lumber Company, one of petitioner's suppliers, and in about 1948 Scott joined petitioner in the contracting business first as a partner, and a few months later, as a founder and equal owner of Jackson and Scott Corporation through which they conducted their contracting business for roughly 20 years. About 90 percent of the corporation's business consisted of constructing buildings for clients, with the development of small parcels for ultimate sale to the public comprising the remaining 10 percent. Petitioner and Scott also undertook larger development projects, but for each of these a separate corporation was organized. One of those corporations was the Vinley Corporation, which they founded in 1958 or thereabout, as equal owners, to acquire and develop into a residential subdivision a large tract of land in San Diego comprising roughly 675 acres and referred to as Del Cerro. About 410 acres were subdivided for the construction of houses to be sold to the public. Jackson and Scott Corporation built more than 200 of those houses, while the rest were built by at least 15 different builders to whom Vinley Corporation "wholesaled" lots. Because of the size *111 of the residential development, some of the land was set aside for commercial development to house the businesses necessary to service the new community. Jackson and Scott Corporation built a small commercial complex composed of a service station, grocery store, and office building containing a doctor's office, beauty parlor, barber shop and real estate office, but Vinley Corporation sold the large parcel set aside for this purpose to someone else for development. When Vinley Corporation was liquidated in 1962, petitioner received for his 50 percent interest therein the three properties comprising the small commercial complex and about 80 acres of remnant land laced with canyons, which had not been considered suitable for residential development. Scott received the more liquid assets of the corporation. Petitioner sold the remnant land, but retained and leased the other properties. In 1966 as the result of a liquidation of another corporation which he had formed with Scott, petitioner received a residence on Marlesta Drive in San Diego which he also retained and rented. On their joint income tax returns for 1967 and 1968 petitioners reported net rental income from these properties *112 of $10,355 and $10,414 in each of those years, respectively. By 1967 Jackson and Scott Corporation was no longer actively engaged in the contracting business. In its stead petitioner conducted his general contracting business initially as a sole proprietor and soon thereafter as a partner with his son in Jackson Construction Co. This company, however, limited its activities entirely to construction work for clients. On their joint returns for 1967 and 1968 petitioners reported $36,627 and $16,763 as petitioner's share of the taxable income of Jackson Construction Co. for each of those years, respectively. Petitioner also found a new partner, Mr. Kuerbis, for his development activities. They formed a partnership, Mellmanor Apartments, which acquired land in 1967 on which a series of apartment buildings was eventually erected and held for the production of rental income. The first rents were not received until 1969. Petitioner also undertook, individually, to manage these apartments and other rental property still held by Jackson and Scott Corporation for which he received management fees that in 1968 totaled $7,500. It was in 1967 that petitioner acquired the property which is *113 the subject of this controversy. At the beginning of that year petitioner held the four rental properties acquired in the 1962 and 1966 liquidations of corporations he had formed with Scott. In January, 1967, he exchanged one of them, the Del Cerro professional office building, which was subject to a mortgage, for a parcel on El Cajon Boulevard in San Diego ("the El Cajon Property"), also subject to a mortgage, and cash in the amount of $38,392.51. As a result of this exchange petitioner realized gain in the amount of $24,978.21 which he and his wife reported on their 1967 joint return as gain on the exchange of a capital asset. The El Cajon property, which was zoned for commercial use, consisted of a lot on which stood two buildings, a store fronting on El Cajon Boulevard and a residence behind it. Most of the property along the boulevard, one of San Diego's major thorough ares, was occupied by a variety of commercial establishments including banks, retail stores and automobile dealerships. The property acquired by petitioner, however, was vacant at the time of the exchange and probably had not been occupied for a few months. Although in usable condition it needed painting and "fixing *114 up", work which petitioner made no effort to have done. He had acquired the property only because the exchange, followed by an immediate sale of the property received therein, seemed to be an attractive means of disposing of the professional office building. He did not intend to retain or rent the El Cajon property. After the exchange petitioner promptly listed the property with a broker for sale at a price equal to the value assigned to it by the parties to the exchange, namely, $39,500. But in the spring of 1967, after several months had passed and the property had not been sold, petitioner withdrew the listing and attempted to dispose of the property on his own. In an effort to accomplish this, he posted a sign on the property and ran classified advertisements in the local newspapers but was unable to find a buyer during the rest of that year and most of 1968. Meanwhile, the property, which was adjacent to a junior high school, suffered considerable damage from vandalism, which was inflicted primarily upon the residence behind the store. Too old and damaged to be worth repairing, and only incidental to the primary use for which the land was best suited, the house was demolished *115 in order to remove it from the tax rolls and at the same time to create additional offstreet parking. Petitioner capitalized the $1,400 he spent to remove the residence. Discouraged by his inability to promptly dispose of the El Cajon property petitioner eventually changed the sign posted thereon to "for sale or for lease or for rent". Petitioner also expressed a willingness to sell or rent to people who inquired about the property. But by this time the building needed substantial repair to be suitable for occupancy, and petitioner, who admittedly "didn't really want a tenant,"failed to make the expenditures that were required to put the property in rentable condition. No listing for rent or lease was given to any real estate agent nor did any of petitioner's newspaper advertisements indicate that the property was for rent or lease as well as for sale. On the advice of his accountant petitioner never claimed deductions for depreciation on any Federal income tax return in respect of the buildings on the El Cajon property. Finally, in November, 1968, nearly two years after he had acquired it, petitioner sold the property for $25,000, realizing a loss of $15,900. On their joint *116 income tax return for 1968 petitioners, describing the El Cajon property as "property held as rental", reported the loss on its sale as a loss on property other than capital assets. In addition they reported as long term capital gains $58,643 in respect of the installment sale in 1966 of the Del Cerro remnant land and $608 from the sale of the Marlesta Drive residence on April 1, 1968. [1] In his deficiency notice the Commissioner determined that the loss incurred on the sale of the El Cajon property was "incurred from the sale of a 'capital asset'" and thus allowable "only to the extent as described by Section 1211". OPINION Whether the loss in question is subject to the statutory limitations upon capital losses turns upon the application of the familiar provisions of section 1221, I.R.C. 1954, [2] in which capital assets are defined. Those provisions state that "* * * the term 'capital asset' means property held by the taxpayer *117 (whether or not connected with his trade or business) * * *", subject, however, to five specified exceptions. Petitioner relies alternatively upon the first and second of those exceptions, contending (1) that the El Cajon property was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business", and (2) that it was "property used in his trade or business". We hold that he is not entitled to prevail upon either of these grounds. 1. The first contention *118 appears to be wholly without merit on the record before us. However petitioner's "business" could have been classified in earlier years, the evidence clearly establishes that during the period in issue petitioner was not engaged either in the business of selling real estate or in any other business in which the El Cajon property was held primarily for sale to customers. The only sales (apart from that of the El Cajon property) of which we have any evidence over the years 1966-1970, inclusive, were sales of capital assets, i.e., sales of a comparatively small number of properties which petitioner treated on his returns as having been held for investment, not held by him "primarily for sale to customers in the ordinary course of his trade or business." Plainly, although the El Cajon property was held by him for sale, it was not so held in connection with the conduct of any business in which he was then engaged. He was not a dealer in real estate. Nor at any time during the period extending from the date he acquired the El Cajon property until its sale, did he own property which he was developing for sale to the public. During the relevant years his business activities were limited *119 to construction of improvements for others under contract, holding and developing real estate for the production of rental income, and managing rental properties. The acquisition of the El Cajon property was not one of a pattern of such acquisitions designed to provide property to sell to customers with or without additional improvement, but the result of an effort to dispose of the Del Cerro professional office building at a suitable price. Indeed, the record reveals no other gains or losses reported by petitioner as gains or losses on the sale of property held primarily for sale to customers in the ordinary course of his trade or business. In these circumstances, we conclude that the El Cajon property was not held primarily for sale to customers in the ordinary course of any trade or business carried on by petitioner. 2. In respect of petitioner's alternative contention -- that the El Cajon property came within the exception to the definition of capital asset in section 1221(2) -- it is not disputed that petitioner rented real property, that such activity constituted a trade or business, nor that the property in question was real or depreciable property. The sole question raised *120 by this contention is whether the El Cajon property was, in fact, used in that trade or business. [3]
To qualify as property "used in his trade or business" within the meaning of section 1221(2) it is not essential that the particular property in question have been actually put to its intended use in the business. Property purchased by a taxpayer for use in his business may come within the scope of section 1221(2) even though that purpose "is later thwarted by circumstances beyond the taxpayer's control". Alamo Broadcasting Co.,15 T.C. 534, 541; Carter-Colton Cigar Co.,9 T.C. 219. Thus, in the case of rental property the mere fact that the property was not rented is not conclusive. Mary E. Crawford,16 T.C. 678, 680-681; N. Stuart Campbell,5 T.C. 272; Burkitt v. United States,100 F. Supp. 237 (D. Ore.). Sustained efforts to rent the property may suffice *121 to bring it within the ambit of section 1221(2). The Code does not demand that the business endeavor be successful. Here petitioner did not acquire the El. Cajon property for use in his trade or business. His only desire at the outset was to sell the property as quickly as possible. However, he argues, a few months prior to its sale he attempted to rent the property, and thereby converted it to property used in his trade or business. And, as he correctly observes, it is the status of the property at the time of sale rather than acquisition that determines its proper classification. Cf. Mauldin v. Commissioner,195 F. 2d 714, 717 (C.A. 10); S. O. Bynum,46 T.C. 295, 299. We do not question petitioner's credibility. No doubt he was unhappy and concerned about holding idle property so long. But the mere willingness to accept a tenant is not enough to bring the property within the ambit of section 1221(2). Many owners of capital assets would undoubtedly be willing to rent them for suitable sums; however, in the absence of serious efforts to rent the property, it cannot be said that it was property used in the rental business. Estate of Maria Assmann,16 T.C. 632. *122 The particular methods employed by a taxpayer to rent his property are of course a matter of his own business judgment, and we will not undertake to judge the wisdom of his decisions in this regard. But the record here, while shedding little light on what affirmative steps may have been taken to rent the property, makes clear those measures that were not pursued. Petitioner did not employ a rental agent nor advertise in newspapers his willingness to rent the El Cajon property despite the fact that at times, similar measures were among those used in efforts to sell the property. Moreover, although the property was no longer suitable for occupancy by the time he reluctantly expressed a willingness to accept a tenant, he did not undertake to make any of the repairs that were required to put the property in rentable condition. Such inaction certainly raises doubts about the earnestness with which petitioner tried to rent the property -- doubts which were enhanced by his candid response when asked whether in light of the condition of the property he could seriously expect to get an acceptable tenant. He replied, "I really wanted to sell it -- I didn't really want a tenant, to be honest *123 with you." On the basis of all of the evidence we find as a fact that the El Cajon property was not property used in petitioner's trade or business relating to rental property. Since neither of the exceptions in paragraphs (1) and (2) of section 1221 is applicable, we must conclude that the El Cajon property was a capital asset. Decision will be entered for the respondent.
Footnotes
1. Petitioners also reported two other amounts as long term capital gains. One was a $3,624 refund of tax assessed upon the liquidation of Vinley Corporation; the other, $169, represented petitioner's share of gain realized by Jackson Construction Co.↩
2. SEC. 1221. CAPITAL ASSET DEFIND. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business * * *.↩
3. There is nothing in the record which suggests that this property was used in any of petitioner's other businesses -- general contracting, managing rental property and developing real estate for the production of rental income.↩