## APPEAL OF EIMER & AMEND.

Docket No. 2270. Submitted May 21, 1925. Decided September 9, 1925.

1. In the absence of competent testimony that an allowance by the Commissioner for exhaustion, wear and tear of steel and brick buildings is insufficient, his determination will not be disturbed.

2. A lessee who purchases or erects buildings upon land leased for a period of years under an agreement that the lessor, in the event the lease is not renewed at the end of its term, will pay to the lessee the appraised value of the buildings at that time, is not entitled to deduct in its return for exhaustion, wear and tear in each of the years during the term of the lease a proportionate cost of the buildings, but is entitled to deduct in each year only a reasonable amount for the exhaustion, wear and tear of such buildings based, in this appeal, upon the cost thereof averaged over their probable useful life.

3. Upon the evidence, *held*, that the taxpayer owned and controlled the stock of the Stuyvesant Glass Co., Inc., during the years 1918, 1919, and 1920, and that the corporations were affiliated within the meaning of section 240 of the Revenue Act of 1918.

*Laurence A. Tanzer* and *James C. Peacock, Esqs.*, for the taxpayer.
*Percy S. Crewe, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from a determination by the Commissioner of deficiencies in income and profits taxes for the calendar years 1918, 1919, and 1920, in the amounts of $7,026.63, $7,241.03, and $2,046.24, respectively.

The issues involved are: (1) Whether the Commissioner was correct in allowing a deduction for exhaustion, wear and tear of buildings purchased or erected by taxpayer on land leased by it, based on the probable useful life of the buildings, instead of upon the remaining life of the lease; (2) assuming that the Commissioner was correct in so computing depreciation, whether the rate of 1 per cent per annum based upon a probable life of 100 years for brick and steel buildings is adequate; and (3) whether the taxpayer and the Stuyvesant Glass Co., Inc., were affiliated during the years 1918 to 1920, inclusive?

### FINDINGS OF FACT.

The taxpayer is a New York corporation engaged in the manufacture of drugs, chemicals, and chemical apparatus. During the years 1918, 1919, and 1920, it conducted its business solely in buildings erected or purchased on land theretofore leased by it for a term of 21 years.

Each lease contained a clause in which it was mutually agreed that the lessor should have full liberty and choice either to grant at the expiration of the lease a renewal for a further term of 21 years at a rental of not less than that provided in the then existing lease, nor in excess of 5 per cent of the appraised value of the vacant lot, said value to be determined by appraisers to be selected one each, respectively, by both lessee and lessor, with a third appraiser to be selected by the two so selected; or, to pay to the lessee an amount equal to the appraised value of the buildings, such value to be determined by appraisers selected as above stated. In the event the lessor did not elect to renew the lease under its terms but refused to lease the property for an additional term, either on account of changed conditions or for any other reason, the lessee should not be compelled to surrender the premises until payment of the appraised value of the buildings should have been made or tendered.

The building located at 209 East Eighteenth Street, New York, was erected by the taxpayer in 1908 at a cost of $149,066.14 on land leased by it in 1907 for a term of 21 years, commencing November 1, 1907, and expiring November 1, 1928. During the year 1909 additions were made to the building which cost $5,160.80, and during 1916 costing $1,242.50. It was a 10-story building with steel framework and brick walls, containing an elevator, plumbing and heating fixtures, a sprinkler system, and other equipment. One floor was used as a machine shop, three floors for glass-blowing, and one floor as a laboratory for the manufacture of chemicals.

The building located at 202-4 East Nineteenth Street, New York, erected by the taxpayer in 1917-18 on land leased in 1917 for a term of 21 years from May 1, 1917, to May 1, 1938, was six stories with steel framework and brick walls, with concrete settings around the windows, and contained an elevator, plumbing and heating fixtures, a sprinkler system, and other equipment. It was erected at a cost of $121,889.77. During the year 1918 additions were made to the building at a cost of $48,445.64, and during 1919 at a cost of $3,031.03.

The building located at 205-11 Third Avenue and 201-3 East Eighteenth Street, New York, was erected in 1886. The building located at 205 East Eighteenth Street was erected in 1896. The land upon which these buildings are located was leased by taxpayer for a term of 21 years, commencing August 1, 1907, and expiring August 1, 1928. The two buildings were purchased by the taxpayer on November 16, 1914, at a cost of $200,000.

The leases covering the land upon which all of the aforementioned buildings were located contained the same provisions with respect to renewal upon their expiration or the payment by the lessor to the lessee at that time of the appraised value of the buildings.

In 1916 the taxpayer incorporated the Stuyvesant Glass Co., Inc., for the purpose of conducting, in separate corporate form, one of its glass-blowing shops in order to secure therein the services of William Wiegand, an expert glass grinder. The entire stock of the company, consisting of 200 shares of no par value, was issued to the taxpayer in consideration of the payment of $5,000.

At the time of the negotiations for his employment William Wiegand agreed to enter the employ of the taxpayer only on condition that he would be in charge of the glass-blowing shop in which he was to work. This was the sole reason for the incorporation of the glass-blowing shop in which said William Wiegand was employed.

At the time of engaging his services taxpayer transferred to William Wiegand, without cost, 10 shares of the stock of the Stuyvesant Glass Co., Inc., and made him manager of the shop. On July 24, 1918, in order to give Wiegand a larger share of profits, taxpayer transferred to him 56⅔ additional shares of stock of the Stuyvesant Glass Co., Inc., upon the distinct understanding that said shares were merely to represent his interest in the profits of that department of taxpayer's business, and that the entire management and control of the business of the Stuyvesant Glass Co., Inc., and of the capital stock thereof should remain in the taxpayer; that the certificates representing the entire holdings of Wiegand were to be returned by him to the taxpayer without compensation in the event of his voluntarily leaving the employ of the Stuyvesant Glass Co., Inc. At the time of transfer of the additional 56⅔ shares of stock on July 24, 1918, the taxpayer and Wiegand entered into a written agreement which provided that in the event Wiegand should voluntarily leave the employ of the Stuyvesant Glass Co., Inc., he would return his entire stockholdings in that company to taxpayer without compensation, and that in the event of discontinuance by the taxpayer of the Stuyvesant Glass Co., Inc., the said Wiegand was to be employed by the taxpayer until the expiration of his then existing contract at a salary of not less than that at which he was employed by the Stuyvesant Glass Co., Inc.

Pursuant to this understanding, the general management of the Stuyvesant Glass Co., Inc., remained entirely in the taxpayer's hands, and it elected a board of five directors, of which Wiegand was one. It conducted the entire business of the Stuyvesant Glass Co., Inc., as a part of its own operations. The Stuyvesant Glass Co., Inc., bought all of its supplies from and sold its entire output to taxpayer. The said Wiegand at the time of and during his employment was interested in no way in the affairs of the Stuyvesant Glass Co., Inc., other than that in the performance of his duties as a glass grinder he should be free from the personal supervision of anyone.

During the years 1918, 1919, and until Wiegand's resignation in 1920, taxpayer controlled the stock held by him. The stock was given to Wiegand to encourage him to make the business a success and to provide an incentive for him through the expectation of receiving dividends measured by this success.

During 1920 Wiegand resigned from the employ of the Stuyvesant Glass Co., Inc., returning to the taxpayer, in accordance with his agreement, all of the stock of the Stuyvesant Glass Co., Inc. Since that time the taxpayer has held directly all the stock in its own name.

The Stuyvesant Glass Co., Inc., was at all times operated merely as a branch or plant facility of the taxpayer. The two corporations were a single business unit during the years 1918, 1919, and 1920.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on consent or on 7 days' notice, in accordance with Rule 50.

### OPINION.

LITTLETON: The questions presented in this appeal are: (1) Whether the Commissioner was correct in computing depreciation based upon the life of the buildings purchased or erected upon leased land, or whether the cost of such buildings should be depreciated over the life of the lease in force during the taxable years involved; (2) if the method used by the Commissioner was correct, whether the rate of 1 per cent is reasonable; and (3) whether the taxpayer and the Stuyvesant Glass Co., Inc., were affiliated during the years 1918, 1919, and 1920?

Under the facts hereinbefore set forth we are of the opinion that the Commissioner was correct in basing the allowance for exhaustion, wear and tear of the buildings upon the probable useful life thereof, instead of upon the term of the lease covering the land upon which such buildings were erected or located at the time they were purchased by the taxpayer. The leases covering the land upon which they were located provided that the lessor should have full liberty and choice either to grant a renewal of the leases for a further term of 21 years at a rental not less than that provided in the then existing lease, but not in excess of 5 per cent of the appraised value of the vacant lot, to be determined by the appraisers, or, in the event the lessor should choose not to renew the lease, he should pay to the lessee an amount equal to the value of the buildings to be determined by appraisers, and that the lessee should not be compelled to surrender the premises until the payment of the appraised value of the buildings had been made or tendered by the lessor.

The annual allowance for exhaustion, wear and tear is for the purpose of permitting the taxpayer to recover its investment in the property at the end of its useful life in the business. Upon the facts in this appeal, we can find no justification in the statute for permitting the taxpayer to charge off during the term of the lease, as wear, tear, and exhaustion, the entire cost of the buildings located upon leased land, because it may be required under the terms of its agreement to receive an amount equal to the appraised value of the buildings at the end of 21 years instead of a renewal of the lease on the land on which such buildings are located.

The taxpayer contends that it should be permitted to exhaust the cost of the property over the period of 21 years. The Commissioner contends that, in view of the provisions of the leases with reference to the purchase of the property by the lessor or the renewal of the leases at the end of 21 years, the deduction for exhaustion of the property should be computed upon the physical life of the property and not upon the basis that taxpayer's investment in the property will be lost at the end of 21 years from the date of the original leases.

We are of the opinion that, under the provisions of the leases in effect during the taxable years, the deduction for exhaustion was correctly based upon the physical life of the property. The deduction for exhaustion of the cost of the property located upon leased premises is governed by the provisions of each particular lease. Had the leases here involved been for a term of 21 years without the right of renewal, or the right of the taxpayer to receive the appraised value of the property upon their expiration, the taxpayer would have been entitled to a deduction for exhaustion over a term of 21 years. Had the leases contained only the provision that upon their expiration they should be renewed for another term of 21 years, the deduction to which the taxpayer would have been entitled over the term of the first leases would be upon the basis of the expected useful life of the property in the business of 42 years, and the deduction during the term of the second leases would be dependent upon the provisions of such leases, and so on until the taxpayer shall have recovered its investment. The leases here involved, however, are peculiar in that they did not definitely provide either for the receipt by the taxpayer of the value of the property upon their termination or for a renewal for another term of 21 years. The result of this, therefore, is that during the term of the first leases the taxpayer is entitled only to a deduction for exhaustion based upon the physical life of the property. If, however, upon the expiration of the present leases the lessor elects to renew them, the taxpayer will then be entitled to exhaust the unextinguished cost over the expected useful life of the property in its business, depending upon the provisions of the leases.

The Commissioner found that the buildings erected by the taxpayer in 1907-8 and in 1917-18 had a probable useful life of 100 years, and allowed depreciation at the rate of 1 per cent per annum; that the buildings purchased in 1914, which had been erected in 1886 and in 1896, had a remaining useful life of 50 years, and allowed depreciation at the rate of 2 per cent per annum. Taxpayer, however, claims depreciation on the building erected in 1907-8 at the rate of 4 per cent per annum; upon the building erected in 1917-18 at the rate of 3 per cent per annum; and upon the buildings erected in 1886 and 1896, and purchased in 1914, at the rate of 4.55 per cent and 3.12 per cent, respectively.

The only evidence before the Board that the allowance for exhaustion, wear and tear determined by the Commissioner is unreasonable, is the opinion of the secretary of the taxpayer, who could not qualify as an expert on real estate, that the probable life of the buildings in question was considerably less than that determined by the Commissioner. Upon this evidence the Board is asked to increase the allowance for exhaustion, wear and tear from 1 per cent and 2 per cent to 3 per cent, 3.12 per cent, 4 per cent, and 4.55 per cent per annum, respectively.

A determination made by the Commissioner is *prima facie* correct.

Upon the evidence submitted by the taxpayer the Board is unable to determine that it is entitled to an annual allowance for exhaustion, wear and tear in excess of that determined by the Commissioner. We can not reject the rate determined by the Commissioner in the absence of evidence that the useful life of the buildings is less than that determined by him. We are forced, therefore, upon the evidence in this appeal to approve the Commissioner's allowance for exhaustion, wear and tear of the buildings in question.

Under the evidence of record, the Board is of the opinion that the taxpayer and the Stuyvesant Glass Co., Inc., were affiliated during the years 1918, 1919, and 1920. It appears that the taxpayer was greatly in need of the services of an expert glass grinder. Finding that it could secure the services of William Wiegand, who was well known to the taxpayer as an expert in that line, providing that it would agree to place him in charge of that branch of the business, and believing that the success of the glass-blowing department of the business depended upon its being able to employ Wiegand, that department was thereupon separately incorporated solely with a view that, under such circumstances, Wiegand would be better satisfied in his employment and that the glass-blowing department would thereby be more productive of profits. Upon incorporation the entire capital stock of the Stuyvesant Glass Co., Inc., was issued to the taxpayer, 10 shares of which it gave to Wiegand as an

incentive for making the glass-blowing department a success and, later, 56⅔ additional shares for the same reason, on condition, however, that it should have the entire management of the business and control of the stock, and, on the further condition, that should the said Wiegand resign said stock should be returned to the taxpayer without compensation. It was also further agreed between the taxpayer and Wiegand that if the taxpayer should discontinue the Stuyvesant Glass Co., Inc., before the expiration of his term of employment, he would be employed by the taxpayer during the remainder of the term of his contract of employment with the Stuyvesant Glass Co., Inc. The taxpayer conducted the entire business of the Stuyvesant Glass Co., Inc., as a part of its own operation. The Stuyvesant Glass Co., Inc., bought all of its supplies and sold its entire output to the taxpayer. The two corporations were operated as a single business unit.

ARUNDELL not participating.