WESTINGHOUSE BROADCASTING COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78254.   Filed August 30, 1961.

*Albert R. Connelly, Esq.,* and *George G. Tyler, Esq.,* for the petitioner.

*John J. O'Toole, Esq.,* for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in petitioner's income tax for the years 1953 and 1954 in the amounts of $363,371.93 and $622,410.13, respectively. Petitioner seeks a determination that it made overpayments of its income tax for those years by reason of additional depreciation of its cost of the affiliation contract and spot advertising contracts which petitioner failed to claim in its returns.

The issues presented are:

(1) Whether petitioner is entitled to depreciation deductions with respect to its purchase price of a network affiliation contract for a specific term but subject to automatic renewal for an indefinite number of terms unless either party gave written notice to the contrary and, if so, the amount of such depreciation; and

(2) Whether petitioner is entitled to depreciation deductions with respect to its basis in 183 spot advertising contracts, which contracts had specific termination dates and, if so, the amount of such depreciation.

FINDINGS OF FACT.

The parties have stipulated as to most of the facts and such stipulations are incorporated herein by reference.

Petitioner, formerly known as Westinghouse Radio Stations, Inc., is an Indiana corporation with its financial office in Pittsburgh, Pennsylvania.

Petitioner's income tax returns for the calendar years 1953 and 1954 were prepared on the accrual basis and were filed with the

collector or director of internal revenue, Pittsburgh, Pennsylvania.

The period of limitations for the assessment against petitioner of deficiencies in income tax liability for the years 1953 and 1954 was extended to June 30, 1959, by agreements between petitioner and respondent under the provisions of section 276(b) of the Internal Revenue Code of 1939 and section 6501(c)(4) of the Internal Revenue Code of 1954.

The notice of deficiency was mailed to petitioner on December 29, 1958.

On June 1, 1953, petitioner purchased from Philco Corporation (Philco) all the assets of television station WPTZ for $8,534,025.94. The purchase was made pursuant to a letter agreement dated February 19, 1953, in which petitioner agreed to pay Philco $8,500,000, which amount was allocated as follows: $5 million for WPTZ's affiliation contract with the National Broadcasting Company (NBC); $1,500,000 for goodwill; and $2 million, subject to adjustment, for other assets which included WPTZ's tangible assets and receivables. The fair market value of such tangible assets and receivables was $1,312,975.15.

Among the assets of WPTZ acquired by petitioner on June 1, 1953, was a network affiliation agreement dated November 23, 1949, between NBC and Philco Television Broadcasting Corporation, which had assigned its rights thereunder to Philco Corporation as of May 14, 1952.

The network affiliation contract set forth the terms of WPTZ's affiliation with NBC. By the terms of the affiliation contract, NBC agreed to supply to WPTZ a variety of network television programs, sponsored or unsponsored, and to give WPTZ the right of first refusal to broadcast such programs in the Philadelphia area. WPTZ agreed, with certain exceptions, to broadcast sponsored programs of the NBC network during hours designated in the contract as "network option time." The financial arrangement set forth in the contract called for a division between WPTZ and NBC of gross billings to network advertisers for WPTZ's station time, WPTZ receiving a one-third share and NBC receiving a two-thirds share, except that for the first 24 hours of network programs broadcast by WPTZ each month's billings were to be paid entirely to NBC. Billing rates were specified in the contract and were subject to change by NBC under conditions therein specified.

Commercial television broadcasting in the United States is supported by advertisers who purchase time and other services of television stations in order to place their commercial announcements before the television audience. Television advertisers are offered station time in a variety of forms. An advertiser may purchase time within which to present a program of entertainment and his com-

mercial announcements, or several advertisers may each contract with a station to have "participating" announcements interspersed throughout a program. A single advertiser may purchase an "adjacency" of 8, 20, or 60 seconds for the broadcast of his message in the interval between programs. The size of the audience which can be expected to see such an adjacency is determined by the quality of the entertainment which precedes and follows the announcement.

Advertisers wishing nationwide coverage may purchase the time of network-affiliated stations through the network, or they may purchase the time of either affiliated or nonaffiliated stations by dealing directly with the stations' sales representatives. Advertisers who seek only regional or local advertising, however, do not use networks but buy time directly from local stations.

Purchases of time by advertisers for network programs account for an average of about 25 percent of an affiliated station's revenues. The balance of the revenues of an affiliated station is derived from direct contracts with other users of the station's facilities.

The rates which a television station is able to charge its advertisers, both network and nonnetwork, are determined by the size of its viewing audience. In any given market, audience level depends on the quality of programs which the station offers and the quality of programs of competing stations.

In order for an unaffiliated station to attract the same audience as competing network stations, it must offer programs of the same quality or attractiveness. It was not economically feasible in 1953 for an independent station to produce programs comparable to network programs because the limited size of the independent station's viewing audience, as compared to the size of the combined audiences of the 50 or more affiliated stations customarily broadcasting network programs simultaneously, made the independent station's cost per viewer too high. Furthermore, in 1953, independent stations and their advertisers did not have any alternative to producing programs themselves because the major producers of movie films had not yet released their libraries of films for television broadcasting.

The difference in audience levels between nonaffiliated and affiliated stations due to the quality of their respective programs made it possible for network-affiliated stations to charge higher rates for station time than the independent stations. It enabled the station to sell more program time and adjacencies at higher prices than independent stations.

In Philadelphia in the years 1951 and 1952, the net sales of station time by the NBC affiliate, WPTZ, exceeded those of the ABC affiliate, WFIL–TV, by $797,500 and $1,330,619, respectively. But during that 2-year period, the broadcast expenses of the two stations were almost equal.

In 1953 the standard yardstick for measuring the value of a television station was five times annual earnings before taxes. The average annual earnings before taxes of WFIL–TV in 1951–1952 were $705,341. The average annual earnings before taxes of WPTZ during the same period were $1,704,459. Use of the standard yardstick would result in valuing the two stations in 1953 at approximately $3,500,000 and $8,500,000, respectively, the latter sum being approximately the price which petitioner paid for WPTZ.

In 1953, networks desired to own stations in the 10 largest markets in the country. At that time, Philadelphia was the fourth ranking United States city in terms of potential television audience, and the largest market in which NBC did not own its affiliate.

In 1952, the FCC allocated three UHF television broadcasting channels to Philadelphia, in addition to the three VHF channels in operation at that time. In 1953 it was not known whether UHF or VHF would be the principal commercial television broadcast band, so that the allocation of UHF channels to Philadelphia posed a constant threat to VHF stations with respect to their network affiliations. A fourth VHF station, WDEL, located in Wilmington, Delaware, was also a threat because it could have been moved to Philadelphia, as was done in 1957. Thus, in 1953, there were seven FCC channel allocations available for stations in the Philadelphia area but only three significant television networks.

Federal Communications Commission regulations in effect during 1953 and 1954 prohibited any contract providing for affiliation for longer than 2 years.[1]

The NBC affiliation contract which petitioner purchased from Philco contained the following provision:

This agreement shall become effective at 3:00 AM, New York City time on the 1st day of January, 1950 and shall remain in effect for a period of two years. It shall then be renewed on the same terms and conditions for a further period of two years, and so on for successive further periods of two years each unless and until either party shall, at least three months prior to the expiration of the then current term, give the other party written notice that it does not desire to have the contract renewed for a further period.

In accordance with the above provisions of the network affiliation agreement, the agreement had been extended in 1951 for an additional 2-year term expiring January 1, 1954. On April 23, 1953, NBC agreed to consent to the assignment of the network affiliation agree-

---

[1] (c) *Term of affiliation.* No license shall be granted to a television broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which provides, by original terms, provisions for renewal, or otherwise for the affiliation of the station with the network organization for a period longer than 2 years: *Provided,* That a contract, arrangement, or understanding for a period up to 2 years may be entered into within 6 months prior to the commencement of such period. [47 C.F.R. sec. 3.658(c) (Rev. 1953).]

ment by Philco Corporation to petitioner and did so consent on June 25, 1953.

Petitioner commenced operation of television station WPTZ as an NBC affiliate on June 1, 1953.

On September 28, 1954, at a conference between representatives of NBC and petitioner which was called by NBC, petitioner was informed that NBC, in order to increase the income available to it for network operations, desired to acquire a television station in Philadelphia.

On November 15, 1954, petitioner sent a letter to NBC assuring that petitioner would proceed in good faith with negotiations as to the transfer of WPTZ and petitioner's Philadelphia radio stations for the Cleveland television and radio stations of NBC. At some time between September 28 and November 15, 1954, petitioner had been informed by NBC that if the Philadelphia-Cleveland transaction should not be consummated, NBC would either acquire WFIL-TV or would enter into an affiliation agreement with WFIL-TV and in either event would terminate the affiliation agreement as to WPTZ.

After negotiation, petitioner on May 16, 1955, entered into an agreement with NBC whereby petitioner agreed to transfer the assets of WPTZ and its Philadelphia radio stations to NBC in exchange for the assets of NBC's Cleveland television and radio stations plus $3 million.

In October 1955, NBC notified petitioner pursuant to paragraph 23 of the network affiliation agreement, set forth above, that it terminated the agreement as of January 1, 1956. Petitioner had granted NBC extensions of time within which to give such notice of termination. The network affiliation agreement therefore expired on January 1, 1956. Since, however, the FCC did not approve the transfer of stations between petitioner and NBC until December 28, 1955, petitioner and NBC on January 5, 1956, entered into a letter agreement dated December 30, 1955, which purported to extend the term of the network affiliation agreement to the date when the transfer of the station's assets should be accomplished or December 31, 1956, whichever date was earlier. The assets of petitioner's Philadelphia television and radio stations were exchanged for the assets of NBC's Cleveland television and radio stations on January 21, 1956.

Facts were not known in 1953 or 1954 from which it could be concluded that this contract would not be renewed again beyond the expiration of its term on January 1, 1956.

Commercial television broadcasting began in 1941, and six stations were operating in 1945. Stations were licensed for 3-year periods by the FCC. On September 30, 1948, the FCC stopped processing applications for new television stations. It did not resume processing such applications until July 1, 1952, at which date there were 108

television stations in operation. The number of television stations in operation on July 1 in succeeding years is as follows:

| Year | VHF | UHF | Year | VHF | UHF |
|------|-----|-----|------|-----|-----|
| 1953 | 152 | 45 | 1957 | 389 | 86 |
| 1954 | 256 | 124 | 1958 | 419 | 82 |
| 1955 | 317 | 104 | 1959 | 437 | 75 |
| 1956 | 363 | 94 | | | |

Between January 1, 1953, and April 1, 1960 (March 1, 1960, as to ABC), 266 affiliation contracts with NBC, CBS, or ABC expired in circumstances other than a station going off the air or the acquisition of the affiliate by the network. Of these expirations, 87 were of NBC affiliation contracts. There is insufficient information to enable this Court to determine the average, probable, or usual life of such contracts or of the contract before us as of 1953 or 1954.

Petitioner acquired from Philco on June 1, 1953, 183 contracts for spot advertising on WPTZ. Each of those contracts was for a specific term expiring not more than 12 months after June 1, 1953. Each contract was terminable by either party on 14 days' notice. The net amount receivable by petitioner under the 183 contracts, if not terminated before expiration, was $1,078,368.58. Petitioner used the 183 contracts in its business of operating WPTZ. $730,000 of the amount paid for the WPTZ assets was allocated to the spot advertising contracts on petitioner's books.

The spot announcement contracts were not purchased as individual contracts, but rather as the entire customer structure (apart from the network affiliation contract) of petitioner's predecessor. The spot announcement contracts, as a customer structure, had an indeterminable useful life.

#### OPINION.

### Issue 1.

Petitioner contends that the network affiliation contract was a depreciable asset. It presented evidence from which it might be concluded that the contract had a cost basis of $5 million to petitioner. On its returns for 1953 and 1954 petitioner took depreciation on the basis of a 55-month useful life, derived from the assumption that such contracts may normally be expected to be renewed twice. On petition and brief, petitioner maintains that events demonstrate this contract had a useful life of only 31 months, since the contract was allowed to expire after only one renewal, and that it should be allowed to depreciate its cost over that shorter period. On petition, petitioner also maintained that this contract's fair market value was at least $6,730,000, and that it should be allowed to depreciate from that basis. However, petitioner offered no evidence on the latter point and does not argue it on brief.

Respondent maintains that the contract's renewability provision makes its useful life indeterminate and that petitioner has failed to show such contracts may be expected to have any determinable useful life. Consequently, respondent has disallowed any deduction for depreciation of this contract.

Both parties rely on section 23(1) of the Internal Revenue Code of 1939, section 167(a) of the Internal Revenue Code of 1954, and the regulations promulgated thereunder.[2]

We agree with respondent that this contract has not been shown to have a determinable useful life.

The contract was renewable automatically unless, at least 90 days prior to the expiration of any 2-year term, either party sent the other written notice of intention not to renew. Petitioner says this renewal clause adds nothing to the contract since parties to any contract may, by agreeing to do so, renew any contract whether or not a renewal clause is present. Absent the renewal clause, it might appear that this contract had a 2-year term and its cost should be depreciated over the 7 months of that term remaining when petitioner purchased the contract.

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

\*       \*       \*       \*       \*       \*       \*

(1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income. \* \* \*

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

Regulations 118 :

Sec. 39.23 (1)–(3) *Depreciation of intangible property.* Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will.

Income Tax Regulations :

Sec. 1.167(a)–3 INTANGIBLES.—If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

By the same token, this automatic renewal clause is no different in effect from a provision for an indefinite term with the right in either party to cancel as of the next biennial anniversary date of the contract. Under such circumstances, the contract has an indeterminate useful life and therefore no deduction may be taken on account of depreciation. *Coca-Cola Bottling Co.*, 6 B.T.A. 1333 (1927). See *David Dab*, 28 T.C. 933 (1957), affd. 255 F. 2d 788 (C.A. 2, 1958).

Only 7 months remained of the then existing term when petitioner purchased the contract. Yet petitioner claims it paid $5 million for this contract. It is incredible that petitioner was not reasonably certain of renewals. *Alamo Broadcasting Co.*, 15 T.C. 534, 544 (1950); *Nachman* v. *Commissioner*, 191 F. 2d 934, 935 (C.A. 5, 1951), affirming *Morris Nachman*, 12 T.C. 1204, 1208 (1949); *Tube Bar, Inc.*, 15 T.C. 922, 930 (1950). See *Lassen Lumber & Box Co.*, 6 B.T.A. 241, 248 (1927).

Petitioner's witness stated that "I don't think any prospective purchaser [of a television station] would enter into a contract unless he felt he could get a renewal."

In fact, petitioner from the first treated this contract for depreciation purposes different from a contract for a term. Petitioner assumed the probability of two 24-month renewals, added that period to the remainder of the term in effect when petitioner purchased the contract, and took depreciation over a 55-month useful life. Even on petition and brief, petitioner expressly concedes that at least the one renewal that took place after it purchased the contract must be added to the useful life of this asset. In so doing, petitioner implicitly concedes that the renewed contract is not a new contract, with its own value and its own useful life, but is a continuation of the useful life of the original contract. *East Kauai Water Co., Ltd.*, 11 T.C. 1014 (1948); *Harris-Emery Co.*, 37 B.T.A. 958 (1938); *William Penn Hotel Co.*, 23 B.T.A. 566 (1931); *Syracuse Washing Machine Corporation*, 17 B.T.A. 11 (1929); *Harris-Emery Co.*, 10 B.T.A. 297 (1928); *Gladding Dry Goods Co.*, 2 B.T.A. 336 (1925). Cf. *Pittsburgh Athletic Co.*, 27 B.T.A. 1074 (1933), affirmed sub nom. *Commissioner* v. *Pittsburgh Athletic Co.*, 72 F. 2d 883 (C.A. 3, 1934); *Helvering* v. *Kansas City American Ass'n Baseball Co.*, 75 F. 2d 600 (C.A. 8, 1935); *Commissioner* v. *Chicago National League Ball Club*, 74 F. 2d 1010 (C.A. 7, 1935); *Bonwit Teller & Co.* v. *Commissioner*, 53 F. 2d 381 (C.A. 2, 1931); *Van Landingham Western Sales, Inc.*, 35 B.T.A. 130 (1936).

The fact that the contract conforms to the maximum term permissible under Federal Communications Commission regulations[3] also suggests that the ostensible term is not necessarily the term really contemplated by the parties to such a contract.

---

[3] 47 C.F.R. sec. 3.658(c) (Rev. 1953), footnote 1, *supra*.

Petitioner relies on *Bonwit Teller & Co.* v. *Commissioner, supra*, where the Second Circuit, reversing a decision of this Court, held that the taxpayer's basis for a 21-year lease renewable for another 21 years was to be depreciated over the remainder of the original term of the lease. The Circuit Court of Appeals reasoned that the renewal clause added to the value of the lease, but not to its useful life. The property to be depreciated—the leasehold then in existence—would expire at the end of its term, to be then replaced (if the renewal option were exercised) by a new property. This Court shortly thereafter, in *Pittsburgh Athletic Co., supra*, acceded to the reasoning of the Second Circuit to the extent of overruling its own prior decisions which had required 1-year renewable baseball player contracts to be depreciated over 3-year useful lives.

However, we have since had occasion to note that the decision in *Bonwit Teller* was affected by the fact that the lease renewal required a redetermination of the rent (*Alamo Broadcasting Co., supra* at 543), that the contract had never been renewed as of the taxable years before the Court, and the issue of probability of renewal was not before the Court (*Morris Nachman, supra* at 1209), and that the Treasury regulations then in effect said nothing regarding the inclusion of renewal terms in the period of useful life. *Hens & Kelly, Inc.*, 19 T.C. 305 (1952). Further, we have noted that *Bonwit Teller* "does not lay down an inflexible rule that the period of exhaustion is the term of the original lease, irrespective of the circumstances attendant to the renewal option; but rather it stands for a rule which must be molded to the facts and circumstances present in each case." *Morris Nachman, supra* at 1209. And, as indicated above, petitioner itself does not adhere strictly to the *Bonwit Teller* position.

*Bernicedale Coal Co.*, 16 B.T.A. 696 (1929), and *Pennsylvania Salt Manufacturing Co.*, 18 B.T.A. 1148 (1930), are cited by petitioner as cases involving renewable contracts which this Court allowed to be depreciated over their original terms. Both involved valuation of the basis for depreciation—*Pennsylvania Salt* involved also the Commissioner's determination that the basis of the contract should be allocated to goodwill. In neither case does it appear that the issue of useful life was put to the Court.

Petitioner points to *Flynn, Harrison & Conroy, Inc.*, 21 B.T.A. 285, 287 (1930), which seems to hold that contract renewal provisions or actual renewals may be ignored in determining useful lives of contracts and that estimates need not be made of the probability of renewal. This doctrine has not been followed by this Court in subsequent cases involving leases (*William Penn Hotel Co., supra; Harris-Emery Co.*, 37 B.T.A. 958, 965 (1938) ; *Leonard Refineries, Inc.*, 11 T.C. 1000, 1010 (1948) ; *Alamo Broadcasting Co., supra; Hens*

*& Kelly, Inc., supra; Jos. N. Neel Co.*, 22 T.C. 1083 (1954)), franchises (*Cleveland Railway Co.*, 36 B.T.A. 208 (1937); *East Kauai Water Co., Ltd., supra*), and licenses (*Morris Nachman, supra; Tube Bar, Inc., supra; V. P. Shufflebarger*, 24 T.C. 980 (1955); *KWTX Broadcasting Co.*, 31 T.C. 952 (1959), affd. 272 F. 2d 406 (C.A. 5, 1959)). This Court specifically stated, in *Cleveland Railway Co., supra* at 211, that the same rationale governs leases, franchises, and contracts and affirmed that view in *Harris-Emery Co.*, 37 B.T.A. 958, 964–965 (1938). This Court made clear its divorcement from the *Flynn, Harrison* view in its unanimous opinion in *Morris Nachman, supra* at 1211; "In addition, we are confronted with the fact of actual renewal of the license during the year before us, and the vitality of this event cannot be minimized." We decline to follow the *Flynn, Harrison* doctrine in this proceeding.

Once the identity of the renewed contract with the original contract for the purpose of establishing useful life is conceded, there remains to be determined the probable useful life of the contract with all its probable renewals.

The probability of future renewals is a question of fact. Respondent has determined that the contract was reasonably certain of renewal indefinitely and the burden is upon petitioner to prove that determination in error. Petitioner must show more than uncertainty as to the length of the contract's useful life. *V. P. Shufflebarger, supra* at 997; *Hens & Kelly, Inc., supra* at 325; *KWTX Broadcasting Co.* v. *Commissioner*, 272 F. 2d 406, 407 (C.A. 5, 1959); *Union Electric Co. of Missouri*, 10 T.C. 802, 805 (1948), affd. 177 F. 2d 269, 274 (C.A. 8, 1949). See *Eimer & Amend*, 2 B.T.A. 603, 608 (1925).

This Court has held that, for purposes of depreciation, determination as to probable useful life must be based upon the "facts known or estimates made at the time a return is filed." *Philadelphia Quartz Co.*, 13 B.T.A. 1146, 1148 (1928) (specifically overruling on this point, *Thomas Coal Co.*, 10 B.T.A. 639 (1928)); *Leonard Refineries, Inc., supra* at 1007, 1011; *Morganton Full Fashioned Hosiery Co.*, 14 T.C. 695, 703 (1950); *Pasadena City Lines, Inc.*, 23 T.C. 34, 39 (1954).

Petitioner's claim for a 31-month useful life for depreciation in 1953 and 1954 is based on the fact that the contract remained in effect that long after petitioner purchased it. But it was not until October 1955 that the network effectively notified petitioner of an intention not to renew the contract again. Petitioner makes much of NBC's 1954 warning that it would not renew the contract. Yet petitioner and the network had to extend from September 30, 1955, the time limit within which an effective notice of intention not to renew could be filed, and the notice was not filed until after the original time limit for that term had passed. We hold that facts were not known before

the returns were filed for the taxable years before us from which it could be concluded that the contract's useful life in petitioner's hands would be only 31 months. Since petitioner's returns for 1953 and 1954 both are based on a 55-month useful life, it could not be said that proper estimates of a 31-month useful life had been made prior to the filing of these returns. See *Hens & Kelly, Inc., supra* at 326.

In support of its original decision to depreciate the contract over a 55-month useful life, petitioner offered testimony as to the practice of the trade. Its witness testified that, in valuing a network affiliation contract for purposes of resale of a station, the practice was to assume two renewals. However, when asked by petitioner's attorney to value the contract, that witness used an entirely different method not shown to be related to this "practice" of assuming two renewals. In any event, we are not convinced that an industry practice as to valuation of a contract is a sufficient indication of that contract's probable useful life. *Coca-Cola Bottling Co., supra* at 1334.

Insufficient evidence was introduced from which could be calculated either the average useful life of network affiliation contracts or their usual life span.

In form, the contract was perpetually renewable on the same terms without either party thereto taking any action or attempting to reach a fresh meeting of the minds. See *David Dab*, 28 T.C. 933, 937, 255 F. 2d at 790; *Alamo Broadcasting Co., supra* at 543; *Hens & Kelly, Inc., supra* at 328. Cf. baseball cases (*Pittsburgh Athletic Co., Helvering* v. *Kansas City American Ass'n Baseball Co., Commissioner* v. *Chicago National League Ball Club*, all *supra*) (salary to be determined); *Bonwit Teller & Co., supra* (rental to be based on appraisal of property at renewal).

We conclude that petitioner has not only failed to persuade us that the contract had a 55-month useful life but also that it has failed to persuade us respondent erred in his determination that the contract had an indeterminable useful life. *Hens & Kelly, Inc., supra; V. P. Shufflebarger, supra.* See *Tube Bar, Inc., Morris Nachman*, and *KWTX Broadcasting Co.*, all *supra.* We therefore sustain respondent in disallowing the deduction on petitioner's 1953 and 1954 returns of an allowance for depreciation on account of the network affiliation contract.

This disposition of the issue makes it unnecessary in this proceeding to decide what basis is to be used for depreciation or whether, as contended in respondent's alternate position, the basis for the contract should be attributed to goodwill. We also do not comment on the taxable effect in 1955 or 1956 of the network's letter of October 1955 canceling the contract as of January 1956, except to note that that letter has no effect on the years before us in this proceeding. *Philadelphia Quartz Co., supra.*

*Issue 2.*

Petitioner contends the spot announcement contracts are depreciable assets. Petitioner originally depreciated these contracts over the same 55-month period it applied to the network affiliation contract. On petition, it claimed the right to depreciate over the lives of the contracts, all of which expired within 1 year after their purchase by petitioner. On brief, petitioner does not discuss the issue of the period over which depreciation should be taken.

Respondent treats these contracts as analogous to goodwill—"the current evidence of a continuous operation, the value of which is included in goodwill and without which no goodwill would exist."

We agree with respondent's determination that no depreciation is allowable on account of the spot announcement contracts.

These contracts were not purchased as individual contracts. In fact, the letter purchase agreement did not specify the price for each contract nor even the total basis assigned to them. Petitioner purchased a mass asset whose value will fluctuate as contracts expire and as new contracts are signed. When confronted with this issue, this Court has consistently held such a mass asset not depreciable because it did not have a determinable useful life (e.g., *Richard M. Boe*, 35 T.C. 720 (1961) ; *Thrifticheck Service Corporation*, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (C.A. 2, 1961) ; *National Weeklies* v. *Commissioner*, 137 F. 2d 39 (C.A. 8, 1943), affirming a Memorandum Opinion of this Court; *The Danville Press, Inc.*, 1 B.T.A. 1171 (1925)) or because it partook too much of goodwill (e.g., *Anchor Cleaning Service, Inc.*, 22 T.C. 1029 (1954) ; *U.S. Industrial Alcohol Co.*, 42 B.T.A. 1323 (1940), modified on other points 137 F. 2d 511 (C.A. 2, 1943)).

Petitioner suggests the latter four cases are irrelevant because they did not involve enforcible contracts and *Thrifticheck* is to be similarly disregarded because the income to be derived from the contracts therein was not determinable in advance. We do not agree that these factual differences existed in all those cases. However, these characteristics of the individual contracts are beside the point since we have found that the contracts here were not purchased as individual contracts. Rather, petitioner purchased its predecessor's entire customer structure, which continued in existence after the close of the taxable years before us. Even though each individual contract purchased by petitioner in mid-1953 had expired by the close of 1954, the mass asset of which it was a part had what was then an indeterminate useful life.

Petitioner relies on *North American Service Co.*, 33 T.C. 677 (1960), where this Court determined the basis of certain highway advertising leases and allowed amortization in proportion to pay-

ments received thereunder. However, in that case it does not appear that any issue was raised as to determinable useful life.

In view of our holding as to useful life, it is unnecessary to determine whether the basis for these contracts should be allocated in whole or in part to goodwill.

Finally, the events of 1955 and 1956 regarding the exchange of petitioner's Philadelphia TV station for an NBC station in Cleveland have no effect on depreciability of the spot announcement contracts in 1953 and 1954. *Philadelphia Quartz Co.*, *supra.*

*Decision will be entered for the respondent.*