Alvin A. Bennati and Marjorie Bennati v. Commissioner.
Bennati v. Commissioner
Docket No. 2090-64.
United States Tax Court
T.C. Memo 1966-140; 1966 Tax Ct. Memo LEXIS 143; 25 T.C.M. (CCH) 727; T.C.M. (RIA) 66140; June 22, 1966
*143 Held, that the petitioners are not entitled to deductions for depreciation with respect to certain dance studio franchises, since they failed to show either the bases or the useful lives of such franchises. Arnold D. Levine, for the petitioners. Edwin A. Easton, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent *144 determined deficiencies in income tax for the taxable years 1959 and 1960 in the amounts of $1,003.92 and $1,057.88, respectively. The petitioners claim an overpayment of income tax for the taxable year 1959 in the amount of $4,495.41. The parties having reached agreement as to some of the issues, the only issue remaining for decision is whether petitioners are entitled to deductions for depreciation under section 167 of the Internal Revenue Code of 1954 with respect to two Arthur Murray dance studio franchises. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioners, who are husband and wife, maintain their residence at 37 Spanish Main, Tampa, Florida. They filed their joint Federal income tax returns for the taxable years 1959 and 1960 with the district director of internal revenue, Jacksonville, Florida. The petitioner Marjorie Bennati had been employed by various Arthur Murray dance studios since 1946, and from 1953 to 1959 was manager of the St. Petersburg studio. The petitioner Alvin Bennati had been employed by various Arthur Murray dance studios since 1953. In or about 1948 petitioner *145 Marjorie Bennati was offered an Arthur Murray dance studio franchise in Buffalo, New York, in competition with an existing Arthur Murray franchise. Although Marjorie Bennati was also offered the necessary financing for the Buffalo operation, she declined to accept the offer, preferring to stay in Florida which is one of the most desirable areas for the operation of dance studios. On October 1, 1956, the petitioners organized a partnership known as the Arthur Murray Dance Studio of Sarastoa, each owning a 50% interest therein. On the same date they entered into an agreement with Arthur Murray, Inc., whereby the latter granted to them a nonexclusive license to use the "Arthur Murray Method" and name in connection with a dancing studio to be conducted by them in the city of Sarasota, Florida, at a location which had been approved by the licensor. Therein the petitioners agreed to pay the licensor a percentage of the weekly gross receipts or a specified minimum amount per year. It was also provided that the licensee should not assign the whole or any part of the agreement or rights granted thereunder without the prior written consent of the licensor. The contract provided that it should *146 continue until the 31st day of August next succeeding the date of execution thereof, and that thereafter the term of the agreement should be automatically renewed each year for a further period of one year unless either party should give written notice at least 30 days prior to the end of any annual period of intention not to renew. In the contract the licensees agreed to honor the unused portion of paid courses of lessons of dancing pupils enrolled in any other Arthur Murray Dancing School owned or licensed by the licensor and it was agreed that the licensees should be entitled to receive therefor a specified sum per hour for dancing instructions so given, such payment to be made to the licensees by the Arthur Murray dancing school which originally enrolled the dancing pupil or, at the option of the licensor, by the licensor. The contract provided for the cancellation thereof by the licensor in the event of breach by the licensees of any of specified requirements of the contract, such as failure of the licensees to maintain uniform policy, methods and rates and the same standard of character and excellence as the New York studio owned by Arthur Murray, Inc.; failure to maintain *147 designated insurance policies; failure to commence or continue the business; failure to transmit to the licensor any monies due it; failure to personally conduct and give full time to the conduct of the business for a specified period of time; and failure to discharge any employee whose discharge was recommended by the licensor for stated causes. It was further provided in the agreement that upon the termination thereof the licensees would not, for a period of one year, engage directly or indirectly in teaching dancing within the particular territory or within a radius of 25 miles of any Arthur Murray dance studio, except as an employee of the licensor or any of its licensees. Attached to such agreement was a rider in which it was recited that the franchise previously granted on June 29, 1953, which had been assigned to the petitioners by the then licensees, was canceled and terminated effective upon the execution of petitioners' franchise agreement. The above agreement was a standard Arthur Murray franchise agreement under which no payment was required for the granting of a franchise, other than the periodic payments referred to above. The above franchise was automatically renewed *148 each year and continued in effect until April 1962, when the petitioners disposed of it. Upon acquisition of the Arthur Murray Dance Studio of Sarasota by the partnership, $5,816.47 was allocated to franchise costs. In its income tax returns the partnership amortized such amount over a period of 48 months, claiming deductions on account thereof for the taxable years 1959 and 1960 in the respective amounts of $1,454.04 and $1,090.70. In the notice of deficiency the respondent adjusted the petitioners' distributable share of the income of the partnership by disallowing the above deductions claimed by the partnership, with the explanation that "The deduction * * * claimed as amortization of franchise costs is disallowed because you have not established that you are entitled to such a deduction." In 1958 Arthur Murray, Inc., offered to grant the petitioners franchises in Tucson, Arizona, and Honolulu, Hawaii, but the petitioners declined the offer. On February 6, 1959, the petitioners entered into an agreement to purchase from John and Patricia Costello, for a consideration of $138,000, all the outstanding shares of stock of C. E. Costello, Inc., and all the right, title, and interest *149 of the sellers in a franchise which they held from Arthur Murray, Inc., for the operation of an Arthur Murray Dance Studio in Tampa, Florida. [1] Therein the sellers agreed to exercise their best efforts to obtain the approval of Arthur Murray, Inc., for the assignment of their franchise to the petitioners, upon which approval the purchase agreement was made contingent. In the agreement it was provided that as "part of the consideration for the transfer of the franchise, the Buyers shall teach all lessons for which students have paid but which lessons are due them, all at the expense of the Buyers." The purchase agreement, which was prepared by the sellers' attorney, contained no allocation of the purchase price between the stock and the franchise. C. E. Costello, Inc., had been engaged in conducting an Arthur Murray dance studio pursuant to the franchise which was held by John Costello. At the time the petitioners acquired the stock of C. E. Costello, Inc., such corporation had, among other assets, [2] a lease on the studio property with an unexpired term of 5 years and an established customer list. It had received payment for 12,000 hours of untaught lessons. *150 By agreement dated March 4, 1959, the petitioners entered into a franchise agreement with Arthur Murray, Inc., to conduct a dancing school under the name of Arthur Murray Dance Studio of Tampa. The provisions thereof were in all essential respects the same as the provisions above described in the Saratosa franchise. However, by letter agreement of March 5, 1959, the franchise agreement was amended to provide that the agreement should commence as of March 5, 1959, and should continue until August 31, 1964, and that thereafter the term of the agreement should be automatically renewed each year for a further period of one year unless either party should give 30 days' notice in writing of intention not to renew. On or about March 31, 1959, a rider to the franchise agreement was executed in which it was provided, inter alia, that the licensees would, at their own cost and expense, teach out all paid for but untaught lessons of pupils of the Tampa, Florida, Arthur Murray studio, and that the franchise agreement between John Costello and the licensor which had been assigned to the licensees by Costello was canceled and terminated. From 1956 or 1957 until 1959 the petitioners were on the *151 executive board of a regional association of Arthur Murray licensees, which dealt with problems faced by the various licensees in the rgion. As a result thereof they had personal contact with other licensees in the Florida area. They were aware that between the years 1954 and 1959 a number of Florida Arthur Murray franchises, after having existed for periods of 4 to 7 or 8 years, had been terminated or canceled by Arthur Murray, Inc., although petitioners did not know the circumstances giving rise thereto. They attempted to obtain a 10-year franchise agreement for the Tampa franchise in order to assure recovery of their outlay of $138,000. As indicated above, they were able to obtain a franchise for only about 5 1/2 years, but at that time officials of Arthur Murray, Inc., indicated that at the end of such term the petitioners might be granted a renewal for an additional 5-year period. The franchise was renewed on September 1, 1965, for a 5-year term, without any change in the terms thereof. After the petitioners acquired the stock of C. E. Costello, Inc., and obtained the franchise from Arthur Murray, Inc., the corporation continued to operate the Tampa studio pursuant to the Arthur *152 Murray franchise which the petitioners had obtained. The petitioners received compensation as employees of the corporation, reporting aggregate wages of $12,500 in their 1959 return and $10,550 in their 1960 return. They had no agreement with the corporation respecting the use of the franchise which they held in their names as individuals, and in their returns for 1959 and 1960 did not report any income received from the corporation for the use of the franchise. On February 1, 1960, the corporation elected to be taxed under subchapter S of the 1954 Code as a small business corporation and filed a small business corporation tax return for the taxable year 1960. The balance sheet showed, as of both the beginning and end of the year, capital stock of $10,000, paid-in or capital surplus of $5,928.34, and earned surplus and undivided profits of $14,398.99. In October 1959 Arthur Murray, Inc., offered the petitioners a franchise agreement for the St. Petersburg, Florida, studio but petitioners declined the offer. In their income tax returns for the taxable years 1959 and 1960 the petitioners did not claim any depreciation deductions on account of their Tampa franchise. However, in their *153 petition to this Court they made claim for a deduction of $11,733.33 for the taxable year 1959 and a deduction of $12,800 for the taxable year 1960 on account of depreciation of the Tampa franchise on the basis of a cost of the franchise of $128,000 and an estimated life thereof of 10 years. In his amended answer the respondent denied that the petitioners are entitled to the claimed deductions for 1959 and 1960. Opinion Section 167 of the Internal Revenue Code of 1954 provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear, and tear of property used in the taxpayer's trade or business or of property held by the taxpayer for the production of income. In general the basis on which depreciation is allowable is the cost thereof. Sections 167, 1011, and 1012 of the Code. Such reasonable allowance is the sum which should be set aside for the taxable year in order that, at the end of the useful life of the asset, the aggregate of the sums set aside will (with any salvage value) suffice to provide an amount equal to the original cost. United States v. Ludey, 274 U.S. 295; Fribourg Navigation Co. v. Commissioner, 383 U.S. 272; *154 and section 1.167(a)-1(a) of the Income Tax Regulations.[3]
The petitioners claim that they are entitled to depreciation deductions for the taxable years 1959 and 1960 with respect to both their Sarasota and Tampa, Florida, *155 Arthur Murray dance studio franchises. The burden of proof is upon them to establish their right to the deductions claimed and the amounts thereof. Burnet v. Houston, 283 U.S. 223. As pointed out above, one of the essential elements to be shown as a prerequisite to the allowance of a depreciation deduction is the cost of the asset. In their returns the petitioners set forth the cost of the Sarasota franchise as $5,816.47. However, the record is devoid of evidence with respect to the acquisition of that franchise. No evidence whatever was introduced to show the cost of such asset, the stipulation of facts merely stating that "Upon the acquisition of the Arthur Murray Dance Studio of Sarasota by the partnership, $5,816.47 was allocated to franchise costs." Under the circumstances, we must conclude that the petitioners have failed to establish this element essential to the allowance of a depreciation deduction with respect to the Sarasota francise. See Watab Paper Co., 27 B.T.A. 488, dism'd. (C.A. 8) 68 F. 2d 998, and Louis Halle, 7 T.C. 245, affd. (C.A. 2) 175 F. 2d 500, certiorari denied 338 U.S. 949. *156 With respect to the Tampa franchise, the petitioners contend that of the $138,000 paid for the stock of C. E. Costello, Inc., and the franchise, $128,000 represented the cost of the franchise. The contract itself contains no allocation of the total price between the franchise and the stock and the petitioners did not explain why there was no allocation made therein; the petitioner Alvin Bennati stated that he could not explain why no allocation was made. The petitioners adduced no evidence to show that it was, nevertheless, the agreement betwen them and the other parties to the contract that $128,000 represented the cost of the franchise and $10,000 the cost of the stock. Neither of them testified as to any details regarding the negotiations leading up to the execution of the contract. And it may be added that the other parties to the contract did not testify. Although the petitioner Marjorie Bennati testified that it was her understanding that $10,000 of the purchase price was allocated to the stock and $128,000 to the franchise, it appears that her understanding was based only upon the fact that C. E. Costello, Inc., reflected its stock in its capital account at a figure of $10,000. *157 The petitioner Alvin Bennati, in answer to a question propounded by his counsel as to whether it was the agreement between himself and his wife and the Costellos to allocate $10,000 of the purchase price to the stock and $128,000 to the franchise rights, stated "I would say it was." While we do not doubt the honesty and sincerity of the petitioners, their testimony amounts to no more than conclusions upon one of the basic questions involved herein, and we therefore cannot find that the parties agreed upon a specific purchase price for each of the two assets. See Estate of Peter Finder, 37 T.C. 411. It is well settled that where a taxpayer purchases an aggregate of assets for a lumpsum purchase price, the price must be allocated, in determining basis, among the assets acquired in accordance with their relative fair market values. F. & D. Rentals, Inc., 44 T.C. 335, on appeal (C.A. 7); Estate of Peter Finder, supra; Harry L. Bialock, 35 T.C. 649; C. D. Johnson Lumber Corporation, 12 T.C. 348; and section 1.167(a)-5 of the Income Tax Regulations. The petitioners have failed to introduce evidence *158 from which we can find the fair market value of either the stock or the franchise. Under the circumstances we must conclude that the petitioners have not met their burden of establishing the cost to them of the Tampa franchise. Another element which the petitioners must show is that the franchises acquired had a limited useful life, and that such life has been or could have been estimated with reasonable accuracy. See section 1.167(a)-3 of the Income Tax Regulations. The petitioners contend that a reasonable estimate of the useful life of the Sarasota franchise was 4 years, as shown in the partnership return, and that a reasonable estimate of the useful life of the Tampa franchise would be 10 years or, alternatively, 4 to 8 years. The respondent contends that the petitioners have failed to establish any basis upon which the duration of the franchises can be estimated with reasonable accuracy. The Sarasota and Tampa franchise agreements each contain a provision for automatic annual renewal unless written notice of intent to terminate is given by either party at least 30 days prior to the expiration of the current term. It is now established that in the *159 case of franchises, and similar contractual arrangements, containing such renewal provisions, it is necessary to consider the probability of future renewals in estimating the useful life thereof. Westinghouse Broadcasting Co$ , 36 T.C. 912, affd. (C.A. 3) 309 F. 2d 279, certiorari denied 372 U.S. 935. In that case we stated in part: The probability of future renewals is a question of fact. Respondent has determined that the contract was reasonably certain of renewal indefinitely and the burden is upon petitioner to prove that determination in error. Petitioner must show more than uncertainty as to the length of the contract's useful life. V. P. Shufflebarger, supra at 997; Hens & Kelly, Inc., supra at 325; KWTX Broadcasting Co. v. Commissioner, 272 F. 2d 406, 407 (C.A. 5, 1959); Union Electric Co. of Missouri, 10 T.C. 802, 805 (1948), affd. 177 F. 2d 269, 274 (C.A. 8, 1949). See Eimer & Amend, 2 B.T.A. 603, 608 (1925). The petitioners contend that the history of cancellations or terminations of Arthur Murray, Inc., franchises in the Florida area shows that the useful life of such a franchise *160 was 4 to 8 years. They testified, in effect, that as a result of their personal contact with other Arthur Murray licensees in the Florida area and their perusal of periodic Arthur Murray, Inc., reports, they were aware that between the years 1954 and 1959 a number of Arthur Murray franchises which had been in existence for periods ranging from 4 to 7 or 8 years had been terminated or canceled by Arthur Murray, Inc. However, they stated that they did not know the circumstances giving rise to the terminations or cancellations, and hence did not know whether the holders of such franchises had violated the terms of their franchises. Insofar as the experience of the petitioners is concerned, they have never failed to obtain a renewal of either of the franchises in question. The Sarasota franchise was automatically renewed from 1956 until 1962, when they disposed of it. The Tampa franchise, which was acquired in 1959 and provided for a term of about 5 years, was renewed on September 1, 1965, for an additional 5-year term, and contained the automatic yearly renewal provision. It is our conclusion that the petitioners have failed to show, either on the basis of their own experience or on *161 the basis of the industry's experience, the useful life of either of the franchises in question. Thus, in this additional respect, the petitioners have failed in their burden of proof. [4]
The petitioners rely upon Indiana Broadcasting Corporation, 41 T.C. 793, reversed (C.A. 7) 350 F. 2d 580, certiorari denied 382 U.S. 1027, in which we held that the useful lives of two television net work affiliation contracts could be determined upon the basis of established general industry experience. However, no comparable probative evidence of industry experience was presented in this case. The petitioners also rely upon the case of Pasadena City Lines, Inc., 23 T.C. 34, in which we held that the cost of a public transportation franchise should be amortized over its term of 10 years. However, that case is not in point here, since *162 in that case there was no automatic renewal clause. In view of our conclusions hereinabove that the petitioners have failed to show the bases and useful lives of the franchises, we find it unnecessary to consider the respondent's further contention that the Tampa franchise did not constitute property used in a trade or business of the petitioners or property held by them for the production of income and that for this additional reason no depreciation is allowable with respect to the Tampa franchise. Decision will be entered under Rule 50. Footnotes
1. The purchase price was to be paid in the following manner: $5,000 down; $20,000 to be paid on or before July 1, 1959; and the balance at the rate of $125 per week or 5% of gross weekly proceeds from the studio (and any other studio operated by petitioners in Hillsborough County, Florida), whichever might be greater, without any interest charge. The stock was to be held by the sellers as security until the payment of the $20,000 due on July 1, 1959. ↩
2. The corporation's return for 1960 shows that it had leasehold improvements made in 1955 at a cost of about $18,700, which had a depreciated cost of about $10,300 at the beginning of 1960.↩
3. The Income Tax Regulations also provide that the estimated useful life is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income; that if the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination; and that if an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance, but that an intangible asset the useful life of which is not limited is not subject to the allowance for depreciation. See sections 1.167(a)-2 and 1.167(a)-3 of the Income Tax Regulations.↩
4. Both parties refer to Michael V. Lawless, T.C. Memo. 1966-12↩, in which we reached a similar conclusion with respect to Arthur Murray dance studio franchises there involved. Each case must be decided upon the evidence presented, and in the instant case we have considered only the record herein.